[No. S006866. May 3, 1990.]

SEAN PATRICK DELANEY et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
ROXANA KOPETMAN et al., Real Parties in Interest.

## COUNSEL

Wilbur F. Littlefield, Public Defender, Laurence M. Sarnoff, Michael Updike and Albert J. Menaster, Deputy Public Defenders, John A. Vander Lans, City Prosecutor, Robert R. Recknagel, Assistant City Prosecutor, Steven Shaw and Gerry L. Ensley, Deputy City Prosecutors, for Petitioners.

No appearance for Respondent.

Gibson, Dunn & Crutcher, Rex S. Heinke, Kelli L. Sager, Sheila R. Caudle, William A. Niese and Glen A. Smith for Real Parties in Interest.

## OPINION

**EAGLESON, J.**—The issues in this case are: (1) whether the term "unpublished information" in the California newsperson's shield law (Cal. Const., art. I, § 2, subd. (b); Evid. Code, § 1070) includes a newsperson's non-confidential, eyewitness observations of an occurrence in a public place; and, (2) if so, whether a newsperson can nevertheless be held in contempt for refusing to disclose such information in a criminal proceeding.

As we shall explain, we hold the shield law's broad definition of "unpublished information" does not require a showing by the newsperson that the information was obtained in confidence. We further hold, however, that a newsperson's protection under the shield law must yield to a criminal defendant's constitutional right to a fair trial when the newsperson's refusal to disclose information would unduly infringe on that right. In this case, the trial court correctly determined that the balance between the rights of the newspersons and the defendant weighs in favor of compelled disclosure. We affirm the judgment of the Court of Appeal.

FACTS

*Underlying Facts*

Real parties in interest, Los Angeles Times reporter Roxana Kopetman and photographer Roberto Santiago Bertero, were accompanying members of a Long Beach Police Department task force on patrol. (For convenience we will sometimes refer collectively to Kopetman and Bertero as the reporters.) The officers observed Sean Patrick Delaney and a companion seated on a bench in the Long Beach Plaza Mall. A plastic bag of a type often used to store narcotics was protruding from Delaney's shirt pocket. The officers inquired about the contents of the bag, and Delaney removed it from his pocket to show that it contained a piece of gold and a piece of jewelry. He told the officers he intended to pawn the items at the mall. Because no pawnshops were in the mall, the officers became suspicious and asked Delaney for his identification. Delaney reached for a jacket lying next to him on the bench as if to get his wallet. According to the officers, they asked Delaney before he picked up the jacket if they could check it for weapons. *He allegedly consented to the search.* An officer ran his fingers along the outside of the jacket and felt a hard object in its pocket. He reached inside and retrieved a set of brass knuckles, which Delaney claimed was a key chain.

Four days later, the Los Angeles Times (hereafter the Times) published an article about the police task force. The article included information regarding the police contact with Delaney but did not refer to whether he had consented to the search of his jacket pocket.

*Procedural History*

Delaney was charged in a misdemeanor complaint with possession of brass knuckles in violation of Penal Code section 12020, subdivision (a). He moved to suppress evidence of the brass knuckles, arguing that he had not consented to the patdown search of his jacket and that the resulting seizure

of the brass knuckles was therefore illegal because the officers had lacked a reasonable suspicion that he was armed. Delaney subpoenaed the reporters to testify at the suppression hearing in municipal court. The reporters moved to quash the subpoenas, contending they could not be compelled to testify because their eyewitness observations of the public search and seizure constituted "unpublished information" protected by the newspersons' shield law from disclosure. The motions were denied.

Following testimony by the officers at the suppression hearing, the reporters were called to testify by the prosecution to demonstrate the legality of the seizure. Their testimony established that each of them observed the events leading to the seizure and that each was situated in a position to observe whether Delaney had consented to the search of his jacket. The reporters, however, refused to answer any questions relating to whether Delaney had consented. The municipal court concluded that the shield law did not apply to the reporters' eyewitness observations of the non-confidential, public circumstances of the search and seizure. The court further found that, even if the shield law applied, the need for the reporters' presumably disinterested testimony on the consent issue outweighed their claim of immunity under the shield law. The court cited both reporters for contempt.

The reporters filed petitions for writs of habeas corpus in the superior court. That court found the shield law provided the reporters with immunity from contempt and granted their petitions.

Delaney and the People of the State of California (through the Long Beach City Prosecutor) filed a joint petition in the Court of Appeal seeking to vacate the orders of the superior court that granted the reporters' habeas corpus petitions. (Delaney's misdemeanor prosecution has been suspended pending final resolution of the reporters' contempt citations.) The Court of Appeal held the shield law does not give a newsperson the right to refuse to testify as to his observations of a public event and ordered the superior court to vacate its orders granting the petitions for writs of habeas corpus. The Court of Appeal's decision was initially unanimous but, after real parties petitioned for rehearing, one justice changed her position and filed a dissenting opinion.

## DISCUSSION

### I. *History of California's Shield Law*

Newspersons had no privilege or immunity under common law to refuse to disclose the identity of their confidential sources. (*Ex Parte Lawrence and*

*Levings* (1897) 116 Cal. 298, 300 [48 P. 124] [upholding contempt citations issued to a newspaper reporter and editor for refusing to disclose confidential sources to the state Senate]; *Mitchell* v. *Superior Court* (1984) 37 Cal.3d 268, 274, fn. 3 [208 Cal.Rptr. 152, 690 P.2d 625] [noting prohibition in Evidence Code section 911 of common law privileges]; Tent. Recommendation and Study Relating to the Uniform Rules of Evidence, art. V, Privileges (Feb. 1964) 6 Cal. Law Revision Com. Rep. (1964) p. 488 [noting that "the newsmen's privilege is entirely alien to the common law"].)[1]

In 1935 the Legislature passed the first shield law. (Stats. 1935, ch. 532, § 1, pp. 1608-1610.) The statute, which was codified as Code of Civil Procedure section 1881, subdivision 6, provided that newspaper employees could not be adjudged in contempt for refusal to disclose their sources to courts or legislative or administrative bodies. Subsequent amendments extended the immunity to employees of radio and television stations, press associations, and wire services. (Stats. 1961, ch. 629, § 1, pp. 1797-1798.) In 1965 the Legislature transferred these statutory provisions to Evidence Code section 1070, which became effective in 1967. (Stats. 1965, ch. 299, § 2, pp. 1297, 1323-1335; Evid. Code, § 12.)[2]

In 1972, a plurality of the United States Supreme Court concluded that the First Amendment to the federal Constitution does not provide newspersons with even a qualified privilege against appearing before a grand jury and being compelled to answer questions as to either the identity of news sources or information received from those sources. (*Branzburg* v. *Hayes* (1972) 408 U.S. 665 [33 L.Ed.2d 626, 92 S.Ct. 2646].) The high court made clear, however, that state legislatures are "free, within First Amendment limits, to fashion their own standards." (*Id.*, at p. 706.)[3]

---

[1] We use the term "newsperson" for convenience to refer to all the categories of persons identified in the shield law. (Cal. Const., art. I, § 2, subd. (b); Evid. Code, § 1070.)

[2] In the remainder of this opinion we refer to Evidence Code section 1070 for convenience merely as section 1070.

[3] There has been considerable debate as to whether the court as a whole in *Branzburg* v. *Hayes, supra,* 408 U.S. 665, recognized a qualified privilege. Four justices dissented from the plurality opinion. Three of them (Justices Brennan, Marshall, and Stewart) would have recognized a qualified privilege; the fourth (Justice Douglas) advocated an absolute privilege. Justice Powell joined the plurality in finding no privilege on the facts before the court but stated his view that the question of privilege should be determined on a case-by-case basis. Justice Stewart subsequently observed that, in light of Justice Powell's concurring opinion, the decision was "perhaps by a vote of four and a half to four and a half." (Stewart, *Or of the Press* (1975) 26 Hastings L.J. 631, 635.) Similarly, counsel for the New York Times in one of the consolidated cases decided in *Branzburg* later acknowledged that " . . . Justice Powell's opinion is singularly opaque . . . ." (Goodale, *Branzburg v. Hayes and the Developing Qualified Privilege for Newsmen* (1975) 26 Hastings L.J. 709.) Despite this lack of clear guidance, ". . . lower federal courts have consistently read the case to support some kind of qualified privilege for reporters." (Tribe, American Constitutional Law (2d ed. 1988) § 12-22, p. 972.) Several state courts have done likewise. In *Mitchell v. Superior Court, supra,* 37

In 1974 the California Legislature amended section 1070 to its present form, apparently in response to *Branzburg, supra,* 408 U.S. 665. (Stats. 1974, ch. 1323, § 1, p. 2877; Stats. 1974, ch. 1456, § 2, p. 3184.) That amendment expanded the scope of the shield law to protect against the compelled disclosure of "unpublished information" as well as sources.

In June 1980, California voters approved Proposition 5, a state constitutional amendment proposed by the Assembly. (Assem. Const. Amend. No. 4, Stats. 1978 (1977-1978 Reg. Sess.) res. ch. 77, pp. 4819-4820.) The proposition incorporated language virtually identical to section 1070 into the California Constitution, as article I, section 2, subdivision (b).[4]

II. *Scope of the Shield Law*

Article I, section 2(b) provides that a newsperson "shall not be adjudged in contempt . . . for refusing to disclose the *source of any information* procured while so connected or employed [as a newsperson] . . . *or* for refusing to disclose *any unpublished information* obtained or prepared in gathering, receiving or processing of information for communication to the public." (Italics added.)[5] ■ Stated more simply, article I, section 2(b)

Cal.3d 268, 277, we concurred in the observation by some other courts that Justice Powell's position was the "minimum common denominator" of *Branzburg* and that the decision therefore does not *preclude* a qualified privilege. We did not decide the question of whether *Branzburg requires* a privilege in some cases. Because *Branzburg* is not dispositive of the present case, we need not linger over the troublesome question of its scope and meaning.

[4] For convenience and brevity we refer in the remainder of this opinion to the constitutional provision as article I, section 2(b). It states in its entirety: "A publisher, editor, reporter, or other person connected with or employed upon a newspaper, magazine, or other periodical publication, or by a press association or wire service, or any person who has been so connected or employed, shall not be adjudged in contempt by a judicial, legislative, or administrative body, or any other body having the power to issue subpoenas, for refusing to disclose the source of any information procured while so connected or employed for publication in a newspaper, magazine or other periodical publication, or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public.

"Nor shall a radio or television news reporter or other person connected with or employed by a radio or television station, or any person who has been so connected or employed, be so adjudged in contempt for refusing to disclose the source of any information procured while so connected or employed for news or news commentary purposes on radio or television, or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public.

"As used in this subdivision, 'unpublished information' includes information not disseminated to the public by the person from whom disclosure is sought, whether or not related information has been disseminated and includes, but is not limited to, all notes, outtakes, photographs, tapes or other data of whatever sort not itself disseminated to the public through a medium of communication, whether or not published information based upon or related to such material has been disseminated."

[5] Because section 1070 and article I, section 2(b) are identical except for minor and insignificant differences in wording, we will discuss only the constitutional provision. Our discus-

protects a newsperson from being adjudged in contempt for refusing to disclose either: (1) unpublished information, or (2) the source of information, whether published or unpublished.[6]

The parties agree there is no attempt to compel the reporters to reveal the identity of a source. Delaney was the source of whatever information the reporters may have as to whether he consented to the police search of his jacket, and his identity is of course already known.[7] Rather, Delaney seeks only the reporters' testimony as to whether he consented to the search. The reporters do not contend they promised to keep confidential any information they obtained or observations they made while preparing their article on the Long Beach Police Department's task force. ■ The question therefore is whether the shield law's definition of "unpublished information" includes a newsperson's unpublished, nonconfidential eyewitness observations of an occurrence in a public place. ■■■■ We conclude that it does.[8]

---

sion of article I, section 2(b), however, applies with equal force to section 1070. (*Union Pacific R.R. Co.* v. *State Bd. of Equalization* (1989) 49 Cal.3d 138, 146, fn. 4 [260 Cal.Rptr. 565, 776 P.2d 267] [noting that our discussion of a state constitutional provision applied with equal force to its substantially identical statutory counterpart].)

[6] As a preliminary matter, we think it necessary to note the occasional mischaracterization of the shield law by the Courts of Appeal. More specifically, the protection provided by the shield law has sometimes been referred to as a privilege. Article I, section 2(b), however, states only that newspersons "shall not be adjudged in contempt." On its face, the shield law does no more than prohibit a newsperson from being held in contempt. Moreover, the Legislature has stressed in reference to identical language in section 1070 that, "It should be noted that Section 1070, like the existing law, provides an immunity from being adjudged in contempt; *it does not create a privilege.*" (Assem. Committee on Judiciary com., 29B West's Annot. Evid. Code (1966 ed.) § 1070, p. 655, italics added.) The California Law Revision Commission has also characterized section 1070 as creating only an immunity, not a privilege. (7 Cal. Law Revision Com. Rep. (Jan. 1965) p. 208.) Likewise, we have recognized that the shield law prohibits only a judgment of contempt and that, unlike a privilege, the shield law does not protect against other sanctions. (*Mitchell* v. *Superior Court, supra*, 37 Cal.3d 268, 274.)

The immunity-privilege distinction has been observed in most cases. For example, in *KSDO* v. *Superior Court* (1982) 136 Cal.App.3d 375 [186 Cal.Rptr. 211], the court stated, "The California shield law . . . is unique in that it affords only limited protection. *It does not create a privilege* for newspeople, rather it provides an immunity from being adjudged in contempt. This rather basic distinction has been misstated and apparently misunderstood by members of the news media and our courts as well." (*Id.*, at pp. 379-380, italics added.) We agree with the *KSDO* court and the others who have correctly noted that the shield law provides only an immunity from contempt, not a privilege. (*Hallissy* v. *Superior Court* (1988) 200 Cal.App.3d 1038, 1045 [248 Cal.Rptr. 635]; *Playboy Enterprises, Inc.* v. *Superior Court* (1984) 154 Cal.App.3d 14, 26 [201 Cal.Rptr. 207].) We disapprove of occasional suggestions, perhaps inadvertent, to the contrary. (*Hammarley* v. *Superior Court* (1979) 89 Cal.App.3d 388, 396-398 [153 Cal.Rptr. 608]; *CBS, Inc.* v. *Superior Court* (1978) 85 Cal.App.3d 241, 250 [149 Cal.Rptr. 421].)

[7] One might also view the police as being a source of this information, but, as with Delaney, their identities are already known.

[8] There is no dispute in this case that the reporters were acting as newspersons and were directly engaged in the process of "gathering, receiving or processing of information for

## A. *Language of the shield law*

We begin with the fundamental rule that our primary task is to determine the lawmakers' intent. (*Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 724 [257 Cal.Rptr. 708, 771 P.2d 406].) In the case of a constitutional provision adopted by the voters, their intent governs. (*Kaiser* v. *Hopkins* (1936) 6 Cal.2d 537, 538 [58 P.2d 1278]; *Armstrong* v. *County of San Mateo* (1983) 146 Cal.App.3d 597, 618 [194 Cal.Rptr. 294].) To determine intent, " 'The court turns first to the words themselves for the answer.' " (*Brown* v. *Kelly Broadcasting Co., supra*, 48 Cal.3d 711, 724, quoting *Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].) "If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature (in the case of a statute) or of the voters (in the case of a provision adopted by the voters)." (*Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].)

The language of article I, section 2(b) is clear and unambiguous as to the question presented in this case. The section states plainly that a newsperson shall not be adjudged in contempt for "refusing to disclose *any* unpublished information." (Italics added.) The parties seeking discovery in this case (Delaney and the prosecutor) contend article I, section 2(b) applies only to unpublished information obtained *in confidence* by a newsperson. Such a construction might be possible if the voters had used the phrase "unpublished information" without the modifier "any." They did not do so. The use of the word "any" makes clear that article I, section 2(b) applies to all information, regardless of whether it was obtained in confidence. Words used in a constitutional provision "should be given the meaning they bear in ordinary use." (*Lungren* v. *Deukmejian, supra*, 45 Cal.3d 727, 735; *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal. Rptr. 239, 583 P.2d 1281].) In the context of article I, section 2(b), the word "any" means without limit and no matter what kind. (Webster's New World Dict. (2d college ed. 1982) p. 62.) To restrict the scope of article I, section 2(b) to confidential information would be to read the word "any" out of the section. We decline to do so. Significance should be given, if possible, to every word of an act.

communication to the public" within the meaning of the shield law when they observed the events as to which their testimony is sought. We emphasize, however, the importance of this requirement. As the Times itself recently recognized, the shield law provides no protection for information obtained by a journalist not directly engaged in "gathering, receiving or processing" news. In an editorial criticizing the Court of Appeal decision in this case, the Times correctly observed that "A reporter who, say, wanders into a liquor store on his way home from work and witnesses a holdup could not invoke the shield law and refuse to testify. *Off the job, a journalist is no different from any other citizen*." (*Breaking the Shield*, L.A. Times (July 20, 1988) Metro Section, pt. 2, p. 6, col. 1, italics added.) We agree.

(*Mercer* v. *Perez* (1968) 68 Cal.2d 104, 112 [65 Cal.Rptr. 315, 436 P.2d 315].) Conversely, a construction that renders a word surplusage should be avoided. (*City and County of San Francisco* v. *Farrell* (1982) 32 Cal.3d 47, 54 [184 Cal.Rptr. 713, 648 P.2d 935]; *California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836].)[9]

We need not rely solely on the voters' use of the word "any." Article I, section 2(b) further states: "As used in this subdivision, 'unpublished information' includes information not disseminated to the public by the person from whom disclosure is sought, whether or not related information has been disseminated and includes, but is not limited to, all notes, outtakes, photographs, tapes or other data of whatever sort not itself disseminated to the public through a medium of communication, whether or not published information based upon or related to such material has been disseminated." Nowhere in this broad definition is there an explicit or implied restriction of article I, section 2(b) to confidential information. To so limit the section, we would have to insert into it the word "confidential" and thus violate the cardinal rule that "The constitution is to be interpreted by the language in which it is written, and courts are no more at liberty to add provisions to what is therein declared in definite language than they are to disregard any of its express provisions." (*People* v. *Campbell* (1902) 138 Cal. 11, 15 [70 P. 918]; *Ross* v. *City of Long Beach* (1944) 24 Cal.2d 258, 260 [148 P.2d 649].)

Delaney contends a reporter's percipient observations of a nonconfidential occurrence are not "information" within the meaning of shield law. This attempted distinction between observations and information is unpersuasive. Under Delaney's strained interpretation, a reporter or any other eyewitness to an automobile accident would have no "information" as

---

[9] Faced with statutes that, like our shield law, protect against forced disclosure of "any information," a clear majority of other states' appellate courts have also found such language to be unambiguous and have held the statutes apply to nonconfidential information. (*Austin* v. *Memphis Pub. Co.* (Tenn. 1983) 655 S.W.2d 146, 149-150 [court declined to insert the word "confidential" into the statute]; *Grand Forks Herald* v. *District Court, etc.* (N.D. 1982) 322 N.W.2d 850, 854 [court found no intent in the the wording of the statute that it be limited to confidential sources]; *Lightman* v. *State* (1972) 15 Md.App. 713 [294 A.2d 149, 156], affd. (Md. 1972) 295 A.2d 212 [language broad enough to emcompass all sources of information].) Although we are not bound by those cases, they do reflect that our decision is in the mainstream of statutory construction. Two state high court decisions to the contrary are plainly distinguishable. (*Knight-Ridder* v. *Greenberg* (1987) 70 N.Y.2d 151 [518 N.Y.S.2d 595, 598-599, 511 N.E.2d 1116] [decision based not on statute's language but on long history of contrary interpretation by the state's lower courts and the state Legislature's not having amended the statute to supersede the lower courts' view]; *Hatchard* v. *Westinghouse Broadcasting* (1987) 516 Pa. 184 [532 A.2d 346, 348-351] [stressing the need for narrow privilege in defamation actions so as not to restrict unduly the plaintiff's ability to recover].)

to the accident. This flies in the face of reason and plain English. ██ "Information" includes "reception of knowledge" and "knowledge obtained from reading, *observation*, or instruction." (Webster's New Internat. Dict. (2d ed. 1958) p. 1276, italics added.) When a reporter or other person is called on to testify as to his observations of an event, he is being asked to disclose information. Moreover, if the distinction between observations and information were logical, the result would be that even a newsperson's *confidential* observations would not be protected. That result would be contrary to the manifest purpose and language of article I, section 2(b).

██ In short, the plain language of article I, section 2(b) leads to only one tenable conclusion. We hold that the shield law's definition of "unpublished information" is not restricted to information obtained in confidence by a newsperson.

B. *Legislative and constitutional history*

The reporters rely on the legislative history of section 1070 to support their view. Delaney and the prosecutor disagree with the reporters' interpretation of that history. It is, however, beside the point for two reasons. First, as we have explained, article I, section 2(b) and section 1070 are virtually identical. In light of our determination that the language of article I, section 2(b) is unambiguous, simple logic compels the same conclusion as to the statute. Thus, we need not go beyond the words of the statute to extrinsic aids such as legislative history. (*Lungren* v. *Deukmejian, supra,* 45 Cal.3d 727, 735.) To do so would violate the principle that, "When statutory language is thus clear and unambiguous there is no need for construction, and *courts should not indulge in it.*" (*Solberg* v. *Superior Court* (1977) 19 Cal.3d 182, 198 [137 Cal.Rptr. 460, 561 P.2d 1148], italics added.) This rule is deeply rooted in our jurisprudence. (*Sturges* v. *Crowninshield* (1819) 17 U.S. 122, 202 [4 L.Ed. 529, 550].)[10]

██ ██ ██ ██ Second, in light of the voters' incorporation of the statutory language into the California Constitution, we need construe only article I, section 2(b).[11] The legislative history of section 1070 would be

---

[10]The dissenting Court of Appeal justice in this case also noted the well-established principle of not going beyond clear and unambiguous language to determine the intent of the Legislature or voters.

[11]There are only three possible conclusions as to the relationship between section 1070 and article I, section 2(b): (1) they have the same scope; (2) the statute is narrower; or (3) the statute is broader. Each conclusion effectively moots the statute. If section 1070 and article I, section 2(b) have the same scope, the statute serves no practical purpose. If section 1070 were *narrower* than article I, section 2(b)—that is, if the statute applied only to confidential information—the statute would have to yield to the broader constitutional provision. The Legisla-

relevant only if it shed some light on the meaning of its constitutional counterpart, article I, section 2(b). The history, however, is of no help in that regard. Article I, section 2(b) is plain on its face, and we need not—indeed, should not—search for external indicia of the voters' intent. (*Lungren* v. *Deukmejian, supra,* 45 Cal.3d 727, 735.) Moreover, the *legislative* history of section 1070 could, as a matter of logic, reflect only the *Legislature's* intent. ██ That history would not provide us with any guidance as to *the voters'* subsequent intent because none of the indicia of the Legislature's possible intent (committee analysis and digest and letters from the statute's author) were before the voters. (*People* v. *Castro* (1985) 38 Cal.3d 301, 311-312 [211 Cal.Rptr. 719, 696 P.2d 111]; *Lungren* v. *Deukmejian, supra,* 45 Cal.3d 727, 742.)[12]

Delaney also relies on the ballot argument in favor of Proposition 5 in 1980, the measure that created article I, section 2(b). Ballot arguments are accepted sources from which to ascertain the voters' intent. (*In*

---

ture could not restrict the shield law placed by the voters into the Constitution because, "Wherever statutes conflict with constitutional provisions, the latter must prevail." (*People* v. *Navarro* (1972) 7 Cal.3d 248, 260 [102 Cal.Rptr. 137, 497 P.2d 481].) The third conclusion—that the statute is *broader* than the Constitution—is not a logical possibility. Because we construe article I, section 2(b) as applying to both confidential and nonconfidential information, there is nothing more the statute could include. In short, the result mandated by article I, section 2(b) renders moot the scope of section 1070. Use of legislative history to determine the scope of the statute would therefore serve no purpose.

[12] Justice Broussard's concurring opinion contends we should rely on the legislative history of section 1070 to find the meaning of its constitutional counterpart, article I, section 2(b). The concurrence does not take issue, however, with our explanation that such history could have no practical effect on our decision. Moreover, the concurrence's reliance on *County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 847-851 [59 Cal.Rptr. 609, 428 P.2d 593], is misplaced. In that case, we considered a lengthy history of judicial decisions consistently construing the statutory (and virtually identical) predecessor of a constitutional provision. There is no similar history for section 1070. Indeed, we have never before construed the substantive scope of section 1070. (*Post,* at p. 803, fn. 16.)

The concurrence does not identify any sources of legislative history. The only sources we know are an analysis by the Senate Committee on the Judiciary of a 1974 amendment (Sen. Bill No. 1858) to section 1070, a digest of the amendment by the Assembly Committee on the Judiciary, and letters written by Senator Al Song, the amendment's sponsor. In *City of Sacramento* v. *State of California, ante,* 51 [266 Cal.Rptr. 139, 785 P.2d 522], on which the concurrence also relies, we noted a prior decision in which we had relied on the history of the statutory forerunner of a constitutional provision. (*Id.,* at p. 67, fn. 11.) In that prior decision—*County of Los Angeles* v. *State of California* (1987) 43 Cal.3d 46 [233 Cal.Rptr. 38, 729 P.2d 202]—we made clear, as we do in the present case, that legislative materials not before the voters are not relevant to determining *the voters'* intent. (*Id.,* at p. 54, fn. 6 and p. 56.) We also explained that the constitutional language before us was quite vague. (*Id.,* at p. 57.) Resort to extrinsic sources of meaning was thus appropriate. Justice Broussard agrees that article I, section 2(b) is unambiguous.

To the extent the concurrence suggests we should rely on letters from Senator Song, we decline for the further reason that we do not consider the motives or understandings of an individual legislator even if he or she authored the statute. (*In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 589 [128 Cal.Rptr. 427, 546 P.2d 1371].)

*re Lance W.* (1985) 37 Cal.3d 873, 888, fn. 8 [210 Cal.Rptr. 631, 694 P.2d 744]; *White* v. *Davis* (1975) 13 Cal.3d 757, 775, fn. 11 [120 Cal.Rptr. 94, 533 P.2d 222].) As with the legislative history of section 1070, however, we need not look beyond the language of the enactment (article I, section 2(b)) when its language is unambiguous. (*Lungren* v. *Deukmejian, supra,* 45 Cal.3d 727, 735.) The ballot argument (unlike the legislative history) is, however, at least relevant to determining *the voters'* intent. We therefore consider the ballot argument (set forth in full in the margin) to determine if it demonstrates the voters did not mean what they said.[13] The repeated references in the argument to confidentiality and the like permit the inference the proponents of the measure intended to protect only confidential information. The same inference may be drawn from the Legislative Analyst's statement.[14] The inference, however, is far from compelling. The ballot materials emphasized the need for confidentiality but did not state that *only* confidential matters would be protected. The most reasonable inference is that the proponents chose to emphasize (in the limited space available for ballot arguments) what they perceived as the greatest need. We cannot conclude that, by emphasizing one purpose, perhaps the primary purpose of the measure, the argument misled voters into thinking confidentiality was

---

[13] The ballot argument stated: "The free flow of information to the public is one of the most fundamental cornerstones assuring freedom in America. Guarantees must be provided so that information to the people is not inhibited. However, that flow is currently being threatened by actions of some members of the California Judiciary. They have created exceptions to the current Newsman's Shield Law, which protects the confidentiality of reporters' news sources. And the use of confidential sources is critical to the gathering of news. *Unfortunately, if this right is not protected, the real losers will be all Californians who rely on the unrestrained dissemination of information by the news media.* [¶] This amendment merely places into the state's Constitution protection already afforded journalists by statute. That law [section 1070], enacted in 1935, in clear and straightforward language, provides that reporters cannot be held in contempt of court for refusing to reveal confidential sources of information. At least six reporters in California in recent years have spent time in jail rather than disclose their sources to a judge. By giving existing law constitutional status, judges will have to give the protection greater weight before attempting to compel reporters to breach their pledges of confidentiality. [¶] A reporter's job, of course, is not to withhold information, but to convey it to the public. In most cases, a reporter is able to reveal corruption and malfeasance within government only with the help of an honest employee. If such an individual feels that a reporter's pledge of confidentiality may be broken under the threat of jail, that person simply will not come forward with his or her information. [¶] If our democratic form of government—of the people, by the people, for the people—is to survive, citizens must be informed. *A free press protects our basic liberties by serving as the watchdogs of our nation.* Citizens may agree or disagree with reports in the media, but they have been informed, and the final choice is made by the individual. [¶] To jail a journalist because he protected his source is an assault not only on the press but on all Californians as well." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Primary Elec. (June 3, 1980) p. 19, italics in original.)

[14] The Legislative Analyst's statement read: "Since 1935, laws enacted by the California Legislature have protected the confidential information sources of persons employed by or connected with the news media . . . . [¶] This measure would place in the California Constitution provisions of existing law enacted by the Legislature to protect news sources . . . ." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Primary Elec., *supra,* p. 18.)

the only purpose, especially when the measure itself made clear that all unpublished information would be protected. Moreover, a possible inference based on the ballot argument is an insufficient basis on which to ignore the unrestricted and unambiguous language of the measure itself. It would be a strained approach to constitutional analysis if we were to give more weight to a possible inference in an extrinsic source (a ballot argument) than to a clear statement in the Constitution itself. We decline to do so.[15]

## C. *Prior California decisions*

Although the relevant amendment to section 1070 was enacted in 1974 and article I, section 2(b) was adopted in 1980, this court has never determined the substantive scope of either provision.[16] The Courts of Appeal, however, have often done so. Initially, the clear majority view in published decisions was that the shield law applies equally to *non*confidential as well as confidential information. (*Hammarley* v. *Superior Court, supra,* 89 Cal.App.3d 388, 395-398; *Playboy Enterprises, Inc.* v. *Superior Court, supra,* 154 Cal.App.3d 14, 20-22; *Hallissy* v. *Superior Court, supra,* 200 Cal.App.3d 1038.) Only one court had restricted the shield law's application to confidential information. (*CBS, Inc.* v. *Superior Court, supra,* 85 Cal.App.3d 241, 250.)

More recently, however, the conflict began to sharpen. In an opinion certified for publication, the Court of Appeal in this case held the shield law applies only to confidential information. Only two weeks earlier, however, a different division of the same district reached a contrary conclusion in an opinion also certified for publication, holding that the shield law protects against the compelled disclosure of any unpublished information, regardless of whether it is confidential. (*New York Times Co.* v. *Superior Court* (1988) 215 Cal.App.3d 672 [248 Cal.Rptr. 426], review granted Oct. 27, 1988 (S006709).) We granted review in both cases to resolve the growing conflict. A third Court of Appeal panel thereafter certified for publication an opinion noting the conflict and agreeing with the Court of Appeal decision in this case, holding that a reporter's eyewitness observations of a public event are

---

[15] We requested the parties to submit supplemental briefs on the issue of whether section 1070 is an unconstitutional usurpation of the California judiciary's inherent power to punish contempt. Because the scope of section 1070 is rendered moot as a practical matter by our construction of article I, section 2(b) (*ante,* pp. 800-801, fn. 11), we need not and do not decide this issue, which would arise only if section 1070 were amended so that it were somehow broader than article I, section 2(b).

[16] Indeed, we have never construed the substantive scope of section 1070 in any of its previous forms, even though it was enacted more than 50 years ago. We briefly considered the procedural scope of section 1070 and article I, section 2(b) in *Mitchell* v. *Superior Court, supra,* 37 Cal.3d 268, 274, in which we observed that neither provision protects a newsperson who is a party to an action from sanctions other than contempt.

not protected by the shield law. (*Liggett* v. *Superior Court* (1989) 211 Cal.App.3d 1461 [260 Cal.Rptr. 161], review granted Oct. 12, 1989 (S011581).)

In light of the conflict that has emerged, the Court of Appeal decisions provide little clear guidance for our decision, and little would be gained by our reviewing them in detail. We note, however, two general themes that appear in the conflict. As we have done in this case, the courts that have applied the shield law to all information have relied on the explicit language of the shield law. (*Playboy Enterprises, Inc.* v. *Superior Court, supra,* 154 Cal.App.3d 14, 20-22; *Hammarley* v. *Superior Court, supra,* 89 Cal.App.3d 388, 395-398.)

By contrast, the courts that have restricted the shield law to confidential information have paid insufficient attention to the shield law's language. For example, in *CBS, Inc.* v. *Superior Court, supra,* 85 Cal.App.3d 241, 250, the court seemed to conclude that no purpose would be served by protecting nonconfidential information. The court did not explain how it found in the shield law a purpose to protect only confidential information. In this case and in *Liggett* v. *Superior Court, supra,* 211 Cal.App.3d 1461, review granted October 12, 1989 (S011581), the courts relied extensively on the legislative history of section 1070 and the ballot argument for article I, section 2(b). As we have already explained (*ante,* pp. 800-803), there is no need to resort to extrinsic aids when a provision is unambiguous and, in any event, the ballot argument and legislative history in this case are too equivocal to overcome the clear definition of "unpublished information" in article I, section 2(b)'s language. We disapprove of those Court of Appeal decisions that hold or suggest the shield law protects only confidential information.

### D. *Public policy*

The parties correctly approach this case as being one of application of a specific constitutional provision. Implicit in their respective arguments, however, are conflicting notions as to appropriate public policy in protecting a newsperson's unpublished information. We need not consider this issue. As we have explained, article I, section 2(b) contains an unambiguous definition of "unpublished information." ■■■ It is bedrock law that if "the law-maker gives us an express definition, we must take it as we find it . . . ." (*Bird* v. *Dennison* (1857) 7 Cal. 297, 307.) ■■■ "[C]ourts, in construing the constitution, are bound to suppose that any inconveniences involved in the application of its provisions, according to their plain terms and import, were considered in its formation, and voluntarily accepted as less intolerable than those which are thereby avoided, or as fully compensated by countervailing advantages." (*People* v. *Pendegast* (1892) 96 Cal. 289,

294 [31 P. 103]; *Sturges* v. *Crowninshield, supra,* 17 U.S. 122, 202 [4 L.Ed. 529, 550].) Our proper function is not to judge the wisdom of article I, section 2(b) or the way in which it is written.

### E. *Conclusion as to scope of shield law*

■ We hold that article I, section 2(b) is not contingent on a showing that a newsperson's unpublished information was obtained in confidence. Article I, section 2(b)'s definition of "unpublished information" includes a newsperson's nonconfidential, eyewitness observations of an occurrence in a public place.[17]

### III. *Delaney's Constitutional Rights*

Our determination that the reporters' observations of the police search are "unpublished information" within the scope of article I, section 2(b) does not decide the issue of whether the municipal court properly held the reporters in contempt for refusing to disclose that information. ■ The reporters themselves concede, as they must, that the shield law's protection is overcome in a criminal proceeding on a showing that nondisclosure would deprive the defendant of his federal constitutional right to a fair trial. Although this court has not decided a case involving the application of the shield law in a criminal prosecution, the principle is beyond question. (*CBS, Inc.* v. *Superior Court, supra,* 85 Cal.App.3d 241, 251; *Hallissy* v. *Superior Court, supra,* 200 Cal.App.3d 1038; *Playboy Enterprises, Inc.* v. *Superior Court, supra,* 154 Cal.App.3d 14, 24-25; *Hammarley* v. *Superior Court, supra,* 89 Cal.App.3d 388, 402; cf. *People* v. *Borunda* (1974) 11 Cal.3d 523, 527 [113 Cal.Rptr. 825, 522 P.2d 1] [defendant seeking identity of anonymous informant].)[18] The incorporation of the shield law into the California

---

[17] Of course, a person claiming the protection of the shield law must meet all its other requirements. He must show that he is one of the types of persons enumerated in the law, that the information was "obtained or prepared in gathering, receiving or processing of information for communication to the public," and that the information has not been "disseminated to the public by the person from whom disclosure is sought." (Art. I, § 2(b).)

[18] Courts have stated almost without exception that a criminal defendant's right to information arises at least in part from the Sixth Amendment to the United States Constitution. (See, e.g., *Hammarley* v. *Superior Court, supra,* 89 Cal.App.3d 388, 398.) For the most part, they explicitly or implicitly refer to the compulsory process and confrontation clauses. In light of recent Supreme Court authority, the reference to the Sixth Amendment may be incorrect in a couple of respects. In *Pennsylvania* v. *Ritchie* (1987) 480 U.S. 39 [94 L.Ed.2d 40, 107 S.Ct. 989], the Pennsylvania Supreme Court had ruled that a lower court's refusal to order the disclosure of a state agency's confidential files in a child abuse investigation violated the confrontation and compulsory process clauses of the Sixth Amendment. A plurality of the high court concluded that the confrontation clause does not apply to pretrial discovery. (*Id.,* at pp. 52-53 [94 L.Ed.2d at pp. 54-55].) As in this case, the shield law is often raised as a pretrial issue, e.g., at a preliminary hearing. Under *Ritchie,* it may no longer be accurate to

Constitution cannot restrict a criminal defendant's *federal* constitutional right to a fair trial. (*Mulkey* v. *Reitman* (1966) 64 Cal.2d 529, 533 [50 Cal.Rptr. 881, 413 P.2d 825], affd. (1967) 387 U.S. 369 [18 L.Ed.2d 830, 87 S.Ct. 1627] [explaining that California constitutional amendment adopted by ballot must conform to the United States Constitution].) Such result would violate the supremacy clauses of the federal and state Constitutions. (U.S. Const., art. VI, cl. 2; Cal. Const., art. III, § 1; *Hammarley* v. *Superior Court, supra,* 89 Cal.App.3d 388, 399, fn. 4.)[19]

■■■■■ The parties disagree, however, as to the nature of the showing a criminal defendant must make to overcome a claim of immunity under the shield law.[20] Delaney contends he need establish only a reasonable possibility that the evidence sought to be discovered might result in his exoneration. The reporters propose a more complex, four-part test under which a defendant would have to show the following: (1) The information must go to the heart of defendant's case. (2) The information must have a significant effect on the outcome of the case. (This proposed element seems to be the same as the "heart-of-the-case" element.) (3) The information is not available from alternative sources. (4) The infringement on the defendant's rights caused by nondisclosure must outweigh the newsperson's interests. (This element seems to be the conclusion a court would reach under the test rather than an element of the test.) As we will

refer to a defendant's Sixth Amendment right in such circumstances. (But see *Kentucky* v. *Stincer* (1987) 482 U.S. 730, 738-739, fn. 9 [96 L.Ed.2d 631, 642-644, 107 S.Ct. 2658] [suggesting in dictum that confrontation clause might in some cases apply to pretrial discovery].) The better practice may be to refer to the right as arising under the due process clause of the Fourteenth Amendment. Similarly, a majority of the *Ritchie* court also found considerable doubt as to whether the compulsory process clause gives a defendant a right to discover the identity of witnesses or to require the state to produce exculpatory evidence. (480 U.S. at p. 56 [94 L.Ed.2d at pp. 56-57].) The court concluded that the better analysis is under the due process clause of the Fourteenth Amendment. Although we note the high court's distinctions for the purpose of accuracy, we find no suggestion in *Ritchie* that the scope of a defendant's right to a fair trial is affected by the label attached to it.

[19] We need not and do not decide whether a newsperson's rights under article I, section 2(b) could be outweighed by a criminal defendant's rights under article I, section 15 of the California Constitution.

[20] We think it helpful to note the proper procedure for resolving a claim of immunity under the shield law. It is hornbook law that a person claiming a privilege bears the burden of proving he is entitled to the privilege. (*Sharon* v. *Sharon* (1889) 79 Cal. 633, 677-678 [22 P. 26]; *Mahoney* v. *Superior Court* (1983) 142 Cal.App.3d 937, 940-941 [191 Cal.Rptr. 425]; 2 Witkin, Cal. Evidence (2d ed. 1986) § 1086, pp. 1030-1031.) Pursuant to its terms, the shield law provides only an immunity from contempt, not a privilege. (*Ante,* at p. 797, fn. 6.) This distinction, however, is not relevant to assigning the burden. Regardless of the label used (privilege or immunity), the shield law's purpose is the same—to protect a newsperson's ability to gather and report the news. The newsperson seeking immunity must prove all the requirements of the shield law have been met. The burden then shifts to the criminal defendant seeking discovery to make the showing required to overcome the shield law. (*Hammarley* v. *Superior Court, supra,* 89 Cal.App.3d 388, 399.) It is the nature of a defendant's showing that we address in the remainder of this opinion.

explain, precedent and principle lead us to conclude that neither test is entirely warranted.

## A. *The proper test for accommodating conflicting constitutional rights*

To formulate the proper test we begin with our decision in *Mitchell* v. *Superior Court, supra*, 37 Cal.3d 268, in which we set forth a balancing test to determine when a reporter must disclose confidential information. We identified four relevant factors for a trial court to consider when making that determination. First, we noted the nature of the proceeding and observed that, "In general, disclosure is appropriate in civil cases, especially when a reporter is a party to the litigation." (*Id.*, at p. 279.) Second, the *Mitchell* court stated the information must be more than merely relevant and that it must go to "the heart of the case" for the party seeking discovery. (*Id.*, at pp. 280-282.) Third, the court stated that discovery should generally be denied unless it is shown that all alternative sources of the information have been exhausted. (*Id.*, at p. 282.) Fourth, *Mitchell* stated that the trial court should consider the importance of protecting confidentiality in the case at hand. (*Id.*, at pp. 282-283.)

Although *Mitchell*, a defamation action, helps to illustrate the competing concerns that arise when a litigant seeks information from a newsperson, an identical approach is not entirely appropriate in a criminal proceeding. We were careful to emphasize in *Mitchell* that "In criminal proceedings, both the interest of the state in law enforcement, recognized as a compelling interest in *Branzburg* (see 408 U.S. 665, 700 [33 L.Ed.2d 626, 650]), and the interest of the defendant in discovering exonerating evidence outweigh any interest asserted in ordinary civil litigation." (*Mitchell, supra*, 37 Cal.3d at p. 278.) We did not consider the factors a court should consider in a criminal case.

### 1. *Threshold showing required*

In now deciding the issue, we must first consider the threshold showing a criminal defendant must make. The reporters claim Delaney must show their testimony would go to the "heart of his case." He contends he need show only a reasonable possibility the evidence might result in his exoneration. On this point, Delaney has the better view. In *CBS, Inc.* v. *Superior Court, supra*, 85 Cal.App.3d 241, the court explained, "Against this right [of a free press] we are obliged to measure the threat to defendants' right to a fair trial. The existence of such a right is clear . . . . [I]t has resulted in the rule that, where a criminal defendant has demonstrated a *reasonable possibility* that evidence sought to be discovered might result in his exonera-

tion, he is entitled to its discovery." (*Id.*, at p. 251, italics in original; *Hallissy* v. *Superior Court, supra,* 200 Cal.App.3d 1038, 1045.) Similarly, in *Hammarley* v. *Superior Court, supra,* 89 Cal.App.3d 388, the court stated, " 'Allowing an accused the right to discover is based on the fundamental proposition that he is entitled to a fair trial and an intelligent defense in light of *all relevant* and reasonably accessible information.' " (*Id.*, at pp. 398-399, quoting *Pitchess* v. *Superior Court* (1974) 11 Cal.3d 531, 535 [113 Cal.Rptr. 897, 522 P.2d 305], italics added.)

We hold that, to overcome a prima facie showing by a newsperson that he is entitled to withhold information under the shield law, a criminal defendant must show a *reasonable possibility* the information will materially assist his defense. A criminal defendant is not required to show that the information goes to the heart of his case.[21]

 A criminal defendant's constitutional right to compulsory process was intended to permit him to request governmental assistance in obtaining likely helpful evidence, not just evidence that he can show beforehand will go to the heart of his case. "The need to develop *all relevant facts* in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of *all the facts,* within the framework of the rules of evidence." (*United States* v. *Nixon* (1974) 418 U.S. 683, 709 [41 L.Ed.2d 1039, 1064, 94 S.Ct. 3090], italics added [claim of presidential privilege].)[22]

The "reasonable possibility" requirement is also far more workable than the "heart of the case" test proposed by the reporters. It would be impracti-

---

[21] It has been stated that the information must be relevant. (*Hallissy* v. *Superior Court, supra,* 200 Cal.App.3d 1038, 1046.) This observation is correct but potentially misleading to the extent it suggests the relevancy requirement arises from the shield law. It does not. The requirement applies to all evidence, whatever its source. (Evid. Code, § 350.) Thus, it is superfluous to state that relevancy is required in shield law cases.

[22] In *Hammarley* v. *Superior Court, supra,* 89 Cal.App.3d 388, 399, and *Hallissy* v. *Superior Court, supra,* 200 Cal.App.3d 1038, 1045-1046, the Courts of Appeal stated that a criminal defendant must also show the evidence is "necessary" to his defense. This restriction might appear to be inconsistent with those courts' concurrent observations that a defendant is entitled to all relevant evidence. Properly understood, however, there is no inconsistency. The *Hammarley* and *Hallissy* courts were referring to two separate factors—the threshold showing required and whether the reporter's information was necessary in the sense that it was unobtainable from another source. Those courts' references to "necessary" information cannot be fairly read to mean information that goes to the heart of a criminal defendant's case, especially in light of their observations as to the need for all relevant evidence. Indeed, neither court determined that the information at issue went to the "heart of the case." Nor did they even use the term. As to the threshold showing required, the decisions are consistent with the test we adopt in this case.

cal to require a trial court to attempt to divine whether the evidence sought from the newsperson would cause a jury to exonerate a criminal defendant. A court cannot be expected to have that degree of prescience. Moreover, if applied literally, the "heart of the case" requirement would allow a defendant to obtain only evidence that would support a directed verdict in his favor.

To provide guidance to the trial courts, we believe it helpful to make clear how the threshold requirement must be applied in practice. First, the burden is on the criminal defendant to make the required showing. (*Hallissy* v. *Superior Court, supra*, 200 Cal.App.3d 1038, 1045.) Second, the defendant's showing need not be detailed or specific, but it must rest on more than mere speculation. Third, the defendant need not show a reasonable possibility the information will lead *to his exoneration*. He need show only a reasonable possibility the information will materially *assist his defense*. The distinction between exoneration and assisting the defense is significant. "Exoneration" means "the removal of a burden, charge, responsibility, or duty." (Black's Law Dict. (5th ed. 1979) p. 516, col. 2.) Stated more simply, in criminal proceedings, "exoneration" is generally understood to mean an acquittal or dismissal of charges. Evidence, however, may be critical to a defense even if it will not lead to exoneration. For example, evidence may establish an "imperfect defense," a lesser included offense, a lesser related offense, or a lesser degree of the same crime; impeach the credibility of a prosecution witness; or, as in capital cases, establish mitigating circumstances relevant to the penalty determination. A criminal defendant's constitutional right to a fair trial includes these aspects of his defense.[23]

2. *Factors to consider*

By meeting the threshold requirement, a defendant is not necessarily entitled to a newsperson's unpublished information. The trial court must then consider the importance of protecting the unpublished information. (*Mitchell, supra*, 37 Cal.3d at pp. 282-283.) This determination may properly be characterized as a balancing of the defendant's and newsperson's respective, perhaps conflicting, interests.[24] The factors to be considered in making this determination are as follows:

---

[23] We need not and do not in this case attempt to enumerate all the ways in which evidence might materially assist a defense. We also need not and do not decide or suggest that traditional testimonial privileges (e.g., attorney-client privilege) should in some circumstances yield to a criminal defendant's federal constitutional right to a fair trial. As Justice Mosk's concurring opinion notes, such privileges may be entitled to greater deference than a newsperson's immunity. (Conc. opn., *post*, at p. 819, fn. 2.)

[24] Justice Mosk's concurrence rejects a balancing approach in favor of a rigid two-part determination. (Conc. opn., *post*, at p. 818.) He agrees a defendant must show a reasonable

### (a) *Whether the unpublished information is confidential or sensitive*

If the information is not confidential, the court should consider whether it is nevertheless sensitive, that is, whether its disclosure would somehow unduly restrict the newsperson's access to future sources and information. (We hereafter refer to this type of nonconfidential information as "sensitive information.")[25] Generally, nonconfidential or nonsensitive information will be less worthy of protection than confidential or sensitive information. Disclosure of the latter types of information will more likely have a significant effect on the newsperson's future ability to gather news. (*U.S.* v. *LaRouche Campaign* (1st Cir. 1988) 841 F.2d 1176, 1180-1182 [noting slight deference due nonconfidential information].) The protection of that ability is the primary purpose of the shield law. (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Primary Elec., *supra*, p. 19; see *ante*, at p. 802, fn. 13.)[26]

### (b) *The interests sought to be protected by the shield law*

Even if the information was sensitive or obtained in confidence, other circumstances may, as a practical matter, render moot the need to avoid disclosure. If, as in this case, the criminal defendant seeking disclosure is himself the source of the information, it cannot be seriously argued that the source (the defendant) will feel that his confidence has been breached.[27] The

---

possibility the information will materially assist his defense. The concurrence, however, states that, once this showing has been made, the defendant is absolutely entitled to the information if there are no "alternative sources of substantially similar information." This approach would provide scant protection to the newsperson, certainly far less than provided by the balancing approach. Under the concurrence, a newsperson could be compelled to disclose highly confidential information, e.g., the name of a witness whose life would be endangered by disclosure. Our balancing approach, however, allows the trial court to consider the importance of keeping information confidential. The concurrence would mandate disclosure no matter how harmful it would be. The concurrence also considers only the defendant's federal constitutional rights and ignores the newsperson's state constitutional rights under the shield law. Rather than merely ignoring our shield law, we think it appropriate to attempt to apply it consistently with the federal Constitution.

[25] To illustrate this type of nonconfidential but sensitive information, we use an example. Assume a reporter is investigating corruption in city government. He obtains information from a city employee who agrees to be quoted and identified. Even so, disclosure of this information in some circumstances might unduly restrict the reporter's ability to complete the story. If he were forced to disclose the source's identity before the articles were published and the source's employment was terminated as a result, other sources might cease to cooperate. That the information sought is not confidential does not necessarily mean it is not sensitive and equally worthy of protection from disclosure.

[26] By emphasizing the need to be especially cautious in ordering disclosure of confidential or sensitive information, we do not suggest that nonconfidential information is entitled to no protection. As we have held above (*ante*, at p. 805), the plain language of the shield law includes nonconfidential information.

[27] Such was the situation in *Hallissy* v. *Superior Court, supra*, 200 Cal.App.3d 1038. A reporter published a story based on an interview with a criminal defendant that led to addition-

reporter's news-gathering ability will not be prejudiced. Other circumstances may also mitigate or eliminate the adverse consequences of disclosure. We do not purport to decide the significance to be given to any future set of facts before a trial court. The point is simply that a trial court must determine whether the policy of the shield law will in fact be thwarted by disclosure.

(c) *The importance of the information to the criminal defendant*

A defendant in a given case may be able not only to meet but to exceed the threshold "reasonable possibility" requirement. For example, he may be able to show that the evidence would be dispositive in his favor, i.e., to use the reporters' phrase, that it goes to "the heart of defendant's case." If so, the balance will weigh more heavily in favor of disclosure than if he could show only a reasonable possibility the evidence would assist his defense.

(d) *Whether there is an alternative source for the unpublished information*

We stated in *Mitchell, supra,* 37 Cal.3d 268, 282, that discovery of a reporter's confidential information should be denied unless the party seeking it "has exhausted all alternative sources of obtaining the needed information." This requirement has also been imposed on criminal defendants. (*Hammarley* v. *Superior Court, supra,* 89 Cal.App.3d 388, 399; *Hallissy* v. *Superior Court, supra,* 200 Cal.App.3d 1038, 1045-1046.) Whether there is an alternative source is indeed a factor for the trial court to consider in a criminal proceeding. In light of a defendant's constitutional right to a fair trial, however, *Mitchell,* a civil case, does not mandate a rigid alternative-source requirement in criminal proceedings.

The facts in *Mitchell, supra,* 37 Cal.3d 268, also suggest the alternative-source requirement may not always be appropriate. In *Mitchell,* the plaintiff sought documents that would reveal confidential sources of information. (*Id.,* at p. 272.)[28] The obvious purpose of the alternative-source requirement

al charges being filed against him.He sought to question the reporter to show the published statements were inconsistent with other statements the defendant had made to the reporter. The trial court correctly noted that "The source of the information is the very person who is seeking the full disclosure." (*Id.,* at p. 1042.) The Court of Appeal, however, paid no heed to this circumstance in reversing an order of contempt against the reporter. As explained above, such circumstance is significant. We disapprove of *Hallissy* to the extent it did not consider the fact that the party seeking disclosure was the source of the unpublished information.

[28] In the other cases cited by the reporters as support for a rigid alternative-source requirement, there was no indication that the information was not confidential. (*United States* v. *Burke* (2d Cir. 1983) 700 F.2d 70, 76-77; *United States* v. *Hubbard* (D.D.C. 1979) 493 F.Supp. 202, 205; *State* v. *Boiardo* (1980) 82 N.J. 446 [414 A.2d 14, 18-19].)

is to protect against unnecessary disclosure of a newsperson's confidential or sensitive information. Where the information is shown to be not confidential or sensitive, the primary basis for the requirement is not present and imposing a rigid requirement would be to sustain a rule without a reason. As we have explained above, the proper balancing in a criminal case must take into account whether the unpublished information is confidential or sensitive and, if so, the importance of protecting the information in a given case. (*Ante*, at pp. 810-811.) For the same reason, a trial court should consider the nature of the information in determining whether to impose an absolute alternative-source requirement in a given case.

We also note that in *Mitchell, supra*, 37 Cal.3d 268, the information request was for documents that would reveal the identity of possible witnesses. We noted that the names of these persons likely could be obtained from sources other than the newsperson. Objective evidence of that nature is likely unaffected by its source. The contents of a document do not depend on the source of the document (assuming no alteration). Similarly, the name of a witness is the same regardless of who provides the name. The evidence sought by Delaney in this case, however, is qualitatively different from that sought in *Mitchell*. Delaney seeks the reporters' testimony as to their percipient observations of the events leading to his search and arrest. Two witnesses to an act may—indeed, likely do—see it differently, and even when their perceptions are substantially the same, their recollection of the event may differ. Moreover, even if their testimony is substantively similar, one witness may have more credibility with a jury. Likewise, two witnesses may convince the jury of a fact where one witness by himself would not do so.

Finally, we note a significant practical difference between this case and *Mitchell, supra*, 37 Cal.3d 268. That case arose out of a pretrial discovery order in a civil case. In light of the wide range of procedures available for pretrial discovery in civil litigation, it is not unreasonable to require a party seeking information from a newsperson to look elsewhere first. There are no similar procedures available to a criminal defendant. For example, he cannot compel a witness's attendance at a deposition and, if unsuccessful in obtaining information, subpoena a different witness. Moreover, the economic reality of the criminal justice system is such that a criminal defendant will generally have less opportunity than a civil litigant to obtain information before trial.

For all the foregoing reasons, we conclude that a universal and inflexible alternative-source requirement is inappropriate in a criminal proceeding. In considering whether the requirement is appropriate in a given case, the trial court should consider the type of information being sought

(e.g., names of potential witnesses, documents, a reporter's eyewitness observations), the quality of the alternative source, and the practicality of obtaining the information from the alternative source. The trial court must also consider the other balancing factors set forth above: whether the information is confidential or sensitive, the interests sought to be protected by the shield law, and the importance of the information to the criminal defendant. In short, whether an alternative-source requirement applies will depend on the facts of each case.[29]

### 3. *Balancing the factors*

Although a trial court must consider the foregoing factors, their relative importance will likely vary from case to case. In some cases, as in the present one, all the factors may weigh strongly in favor of disclosure. In others, the balance may be more even, and in some cases one factor may be so compelling as to outweigh all the others. We decline to hold in the abstract that any factor or combination of factors must be determinative. A mechanistic, checklist approach would not in the long run (nor perhaps even in a particular case) serve the best interests of either newspersons or criminal defendants.

### 4. *Whether an in camera hearing is required*

The reporters contend an in camera hearing must be held in every case before a newsperson can be forced to disclose unpublished information. The contention is overbroad. The purpose of an in camera hearing is to protect against unnecessary disclosure of confidential or sensitive information. The reporters fail to explain what purpose an in camera hearing would serve when the information, as in this case, is admittedly not confidential or sensitive.[30] In the cases cited by the reporters, the information was at least arguably confidential. For example, in *CBS, Inc.* v. *Superior Court, supra,* 85 Cal.App.3d 241, the Court of Appeal remanded to the trial court for an in camera hearing but noted the newspersons' "claimed pledge of secrecy." (*Id.,* at p. 254.) The reporters' reliance on *Hammarley* v. *Superior Court, supra,* 89 Cal.App.3d 388, in which the court affirmed a contempt judgment, is even more misplaced. In *Hammarley,* the newsperson argued that the shield law immunity was absolute and that an in camera hearing should

---

[29] We disapprove of suggestions by the Courts of Appeal that a criminal defendant must in every case show the lack of an alternative source regardless of the circumstances. (*Hammarley* v. *Superior Court, supra,* 89 Cal.App.3d 388, 399; *Hallissy* v. *Superior Court, supra,* 200 Cal.App.3d 1038, 1046.)

[30] Aside from the lack of a need to protect secrets, there is no practical difference in terms of inconvenience to the newsperson. Whether he testifies in open court or in camera, the same amount of his time ordinarily will be required.

not have been allowed. The Court of Appeal concluded to the contrary. (*Id.*, at pp. 402-403.) The decision in no way supports the view that an in camera hearing is required in every case.[31]

When a criminal defendant, however, seeks confidential or sensitive information, the practical need for an in camera hearing is obvious. The shield law would be illusory if a reporter had to publicly disclose confidential or sensitive information in order for a court to determine whether it should remain confidential or sensitive. We emphasize, however, that a trial court need not waste its valuable resources for an in camera hearing based on a specious claim of confidentiality or sensitivity.[32] The court has discretion in the first instance to determine whether a newsperson's claim of confidentiality or sensitivity is colorable. If the court determines the claim is colorable, it must then receive the newsperson's testimony in camera.

B. *Application of the proper test to this case*

■■■ Under the proper balancing test set forth above, Delaney was clearly entitled to the reporters' testimony as to whether he consented to the police search of his jacket.

*Threshold showing*—Even under the test advocated by the reporters (heart of the case), Delaney would be entitled to their testimony. The municipal court explained to the reporters' counsel the lack of probable cause for the search: "If there were probable cause for the search, I guarantee you the prosecutor would not be introducing the matter of [Delaney's] consent." The court explained that if there was no consent the search was therefore illegal, and the charge against Delaney would have to be dismissed. Conversely, if he consented to the search, it was legal, the brass knuckles would be admitted into evidence, and Delaney would have little chance of an acquittal. As the court put it, the case "will rise or fall on the admission or not of those metal knuckles." We agree. It is an understatement to say, in the words of the test we adopt, that there is a reasonable

---

[31] In the other decisions on which the reporters rely, the information also appears to have been confidential. The precise nature of the information is not explained in each of those decisions, but the courts emphasized the need to protect confidential information, and there were no allegations that the information was not confidential. (*United States* v. *Cuthbertson* (3d Cir. 1981) 651 F.2d 189, 195-196; *United States* v. *Burke, supra*, 700 F.2d 70, 76-77; *United States* v. *Hubbard, supra*, 493 F.Supp. 202, 205; *Green Bay Newspaper* v. *Circuit Court* (1983) 113 Wis.2d 411 [335 N.W.2d 367].)

[32] For example, a newsperson cannot create confidentiality or sensitivity where there is none. Assume that a reporter covering a hockey game witnesses, together with everyone else present, a brawl on the ice that results in criminal charges against a player. If the shield law applied in such circumstance, a trial court would not be required to proceed in camera based on the reporter's assertion that he viewed the game or the fight in confidence.

possibility the reporters' testimony will assist Delaney in his defense. There is a substantial certainty that the reporters' testimony will materially affect the outcome of the criminal proceeding. Delaney has met and surpassed the required threshold showing.

*Balancing factors*—The balance weighs overwhelmingly in favor of requiring the reporters to testify. A brief review of the factors to be balanced makes this clear.

(1) Whether the unpublished information is confidential or senstitive—As we have already noted, the reporters do not claim their percipient observations of Delaney's search and arrest in a public place were made in confidence or were sensitive.

(2) The interests sought to be protected by the shield law—There is not even a suggestion in this case that the reporters' testimony would impinge on their future news-gathering ability or other interest, if any, sought to be protected by the shield law. Both parties who were observed by the reporters (Delaney and the police) are seeking their testimony. Thus, it cannot be said the parties or anyone else would be reluctant to provide these reporters with future information based on a belief that the reporters had breached a confidence or divulged sensitive information.

(3) The importance of the information to the criminal defendant—As explained above, the reporters' testimony will likely be determinative of the outcome of this case.

(4) Whether there is an alternative source for the unpublished information—We have explained that a criminal defendant need not always show the lack of an alternative source for a newsperson's unpublished information. We need not consider whether such a showing was required in this case because the municipal court implicitly assumed that it was required, and Delaney made a satisfactory showing. At the hearing on the motion to suppress, the reporters' counsel suggested that Delaney be required to take the stand and testify as to whether he had consented to the search. The court promptly advised counsel as to a defendant's constitutional right not to do so.[33] Counsel also urged as alternative sources Delaney's companion, who was present at the time of the search, and four other officers who might have been within hearing distance of the search. The court correctly explained that neither the companion nor the other officers would be *disinterested* witnesses. The *only* two persons fitting that description are the two

---

[33] The reporters' appellate counsel also incorrectly suggest in their brief to this court that Delaney should be required to testify.

reporters. Thus, contrary to their assertion, their testimony would not be merely cumulative to that of the other potential witnesses. We concur in the municipal court's determination that there was no meaningful alternative source for the reporters' testimony.

In short, the court struck the correct balance. Delaney's personal liberty is at stake. The reporters are not being asked to breach a confidence or to disclose sensitive information that would in any way even remotely restrict their news-gathering ability. All that is being required of them is to accept the civic responsibility imposed on all persons who witness alleged criminal conduct.

## C. *Standard of appellate review*

 Finally, the reporters contend almost in passing that we are not bound by the municipal court's decision, which they characterize as being comprised of legal conclusions rather than factual findings. The reporters attack the decision on two grounds. First, they contend it is not supported by substantial evidence. We disagree. We have reviewed the record and, as set forth above, we find the municipal court's decision to be amply supported.

Second, the reporters contend we are required to exercise our independent judgment as to the correctness of the municipal court's order of contempt because important constitutional interests are at stake. Apparently, the reporters would have us hold that independent appellate judgment is mandated in all cases under the shield law. Article I, section 2(b) makes no provision for such a standard of review. Nor do the reporters cite authority from any jurisdiction requiring such review under a shield law. We need not and do not decide the issue, however, because, as noted above, we have reviewed the record, and we independently conclude without difficulty that it fully supports the municipal court's thoughtful decision.[34]

[34] This case is somewhat unusual in that both Delaney and the prosecutor are seeking the reporters' testimony. (This fact further supports the municipal court's decision that the testimony is pivotal.) Although the reporters concede that a criminal defendant has a constitutional right to a fair trial, they contend, without citing any authority, that the prosecution does not have a similar right to obtain information subject to the shield law. Of course, the prosecutor vigorously disagrees. There is authority which *suggests* that a state may have a right sufficient to overcome a claim of immunity under the shield law. (*Mitchell, supra,* 37 Cal.3d 268, 278; *Branzburg, supra,* 408 U.S. 665, 700 [33 L.Ed.2d 626, 650-651]; *United States* v. *Nixon, supra,* 418 U.S. 683, 709 [41 L.Ed.2d 1039, 1064-1065].) In light of our determination, however, that Delaney is entitled to the reporters' testimony, the question as to the state's right to the same evidence is rendered moot. We therefore need not, and do not, decide whether the prosecution in a criminal proceeding can have a constitutional interest sufficient to require the disclosure of information otherwise protected by the shield law.

## Disposition

The judgment of the Court of Appeal is affirmed. The Court of Appeal is directed to issue a peremptory writ of mandate compelling respondent Los Angeles Superior Court: (1) to vacate its orders entered December 16, 1987, in case numbers HC 206320 and HC 206321, entitled In re Roxana Kopetman and In re Roberto Santiago Bertero, respectively, which orders granted their petitions for writs of habeas corpus; and (2) to simultaneously make new and different orders denying the petitions for writs of habeas corpus.

Lucas, C. J. (as to part III), Panelli, J., Kennard, J., and Kremer (Daniel J.), J.,* concurred.

**MOSK, J.,** Concurring.—While I concur that Sean Patrick Delaney is entitled to the reporters' testimony concerning their eyewitness observations of the police search of his jacket, I do not agree with the balancing test proposed by the majority. Since federal constitutional rights are supreme, and since the reporter's constitutional immunity is absolute on its face in protecting *all* unpublished information obtained during the course of news gathering, it is not for us to balance competing state and federal interests. Rather, our sole task is to determine how far the state constitutional immunity can be extended before it trespasses on the Fifth and Sixth Amendment rights of criminal defendants. If invocation of the constitutional immunity deprives the defendant of information necessary to exercise those rights, then he is entitled to that information in spite of the reporter's constitutional immunity. If the information is not necessary to exercise those rights, he is not so entitled.

Instead, the majority propose a complicated four-factor test to be used by courts in weighing the relative merits of reporters' and defendants' claims. Two of the factors—(a) and (b)—consider the importance of the information from the reporter's viewpoint. Factor (c) would consider the information's importance to the defendant. The fourth factor allows the trial court to consider the ease of obtaining the information from alternative sources. No single factor is to be determinative.

This balancing test harbors a basic conceptual flaw.[1] If our role is to determine whether the defendant can obtain a fair trial when confronted

---

*Presiding Justice, Court of Appeal, Fourth Appellate District, Division One, assigned by the Chairperson of the Judicial Council.

[1] Part of the problem with a balancing test may stem from the fact that a similar balancing approach is used in the First Amendment qualified-privilege cases, the progeny of *Branzburg* v. *Hayes* (1972) 408 U.S. 665 [33 L.Ed.2d 626, 92 S.Ct. 2646]. In those cases, courts, following Justice Powell's concurrence in *Branzburg*, have inquired into the impact a disclosure of

with the reporter's claim of immunity, then the significance of the information from the reporter's viewpoint is irrelevant. All that matters is the importance of the information from the *defendant's* viewpoint. Instead of delineating the boundary of the defendant's rights and permitting the reporter's immunity to apply to all information outside that boundary, as the federal and state Constitutions dictate, the majority substitute their concept of the optimal balancing of reporters' and defendants' interests. Thus, the majority favor confidential and "sensitive" information over non-confidential, nonsensitive information, despite their earlier recognition that article I, section 2(b) makes no such distinctions.

For the reasons elaborated below, I would require that a defendant make two threshold showings, both of which relate to the defendant's demonstration of need for the information. First, as the majority hold, the defendant must show a reasonable possibility exists that the information will assist the truth-seeking process. Second, he must show that alternative sources of substantially similar information are unavailable. Once the defendant carries his burden of making these two showings, he will be entitled to the information. Because I conclude that information obtained by a reporter as a percipient witness of a transitory event is by its very nature unavailable from alternative sources, I concur in the majority's judgment that the defendant in this case is entitled to the reporters' testimony.

I. *The Scope of Fifth and Sixth Amendment Rights and the Alternative-source Rule*

The rights of confrontation and compulsory process under the Sixth Amendment, and the more general right to a fair trial under the Fifth Amendment, are not absolute. Rather, they are exercised in a framework of state law privileges, immunities, and rules of evidence that sometime block access to information needed by the defendant. (See *Chambers* v. *Mississippi* (1973) 410 U.S. 284, 302-303 [35 L.Ed.2d 297, 309, 93 S.Ct. 1038] [a holding that strikes down an unreasonable hearsay rule on due process grounds does not "signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own

---

information will have on the reporter's news-gathering ability. Courts had to determine at the threshold whether revelation of the information would burden reporters sufficiently to raise a First Amendment claim. (See, e.g., *U.S.* v. *LaRouche Campaign* (1st Cir. 1988) 841 F.2d 1176.)

In this case, the claim is not based on the First Amendment but on a specific state constitutional provision (Cal. Const., art. I, § 2, subd. (b) (hereafter article I, section 2(b)) that covers all unpublished information gathered by journalists in the course of their duties. Inquiry into the importance of the information to the reporter and the burden it would impose on him or her is not needed to determine whether the information falls within the scope of article I, section 2(b). Nor, indeed, does that provision permit such an inquiry.

criminal trial rules and procedures"]; *Washington* v. *Texas* (1967) 388 U.S. 14, 23, fn. 21 [18 L.Ed.2d 1019, 1025, 87 S.Ct. 1920] [a ruling that strikes down on compulsory process grounds a state law prohibiting coconspirators from testifying on each other's behalf does not invalidate traditional testimonial privileges].) While consistency has not been a hallmark in this area, courts have been extremely reluctant to make incursions into state law testimonial privileges—e.g., the attorney/client, priest/penitent, or marital communications privileges—on Sixth Amendment grounds. (See Note, *Defendant v. Witness: Measuring Confrontation and Compulsory Process Rights Against Statutory Communications Privileges* (1978) 30 Stan.L.Rev. 935 (hereafter *Defendant v. Witness*).)

Recognizing the peaceful coexistence between the Sixth Amendment and traditional testimonial privileges, courts have tended to employ a functional, pragmatic approach in reconciling fair trial rights with the less traditional state law privileges, such as the reporter's privilege.[2] Such a functional approach was typified by the New Jersey Supreme Court in *State* v. *Boiardo* (1980) 82 N.J. 446 [414 A.2d 14]. As the court reasoned, the Sixth Amendment rights of confrontation and compulsory process are necessary to ensure that our adversary system results in " 'full disclosure of all the facts and a fair trial, within the framework of the rules of evidence.' " (414 A.2d at p. 19, quoting *United States* v. *Nixon* (1974) 418 U.S. 683, 709 [41 L.Ed.2d 1039, 1064, 94 S.Ct. 3090].) When full disclosure can be accomplished without interfering with the reporter's privilege, the defendant will be able to receive as fair a trial as the state can ensure, without having to resort to a breach of the reporter's privilege. As Chief Justice Wilentz wrote: "[I]f substantially similar material can be obtained from other sources, both the confidentiality needed by the press and the interests of the defendants are protected." (414 A.2d at p. 21.)

Unlike the majority's approach, the court in *Boiardo* did not attempt to balance the respective importance of the information for the reporter and the defendant. Rather, the New Jersey Supreme Court sought to determine, at the threshold, whether defendant would be deprived of a fair trial if information necessary to his defense was withheld. In that case the defendant sought a copy of a letter that a reporter possessed and the defendant believed would assist him in impeaching a key prosecution witness. The

---

[2] The majority's holding in this opinion, of course, does not apply to the traditional testimonial privileges. It may be that those privileges should be accorded more protection than the reporter's immunity, because they are consistent with a fair trial as that concept was understood in 1791, when the Fifth and Sixth Amendments were adopted. It may also be that violation of certain privileges implicate federal constitutional rights of their own, such as the right to counsel or the right to free exercise of religion. A more comprehensive treatment of the conflict between testimonial privileges and fair trial rights awaits further development when these matters are properly before us.

court concluded that the defendant had not carried his burden of showing that the information was unavailable from an alternative source, and therefore upheld the reporter's privilege.

The requirement of a threshold showing that no alternative source of information is available (hereinafter called the alternative-source rule) can, therefore, reconcile reporter's immunity and defendant's rights so as to give effect to both. Unlike the majority's multifactored approach, the alternative-source rule remains focused on the single decisive question: does the defendant need the information to obtain a fair trial? The alternative-source rule also incorporates a functional approach to the defendant's fair trial rights, based on the recognition that these rights exist within a framework of state law privileges and immunities. What one commentator stated of the communications privilege applies at least equally to the reporter's immunity: "A communications privilege would be of little value if a [criminal] defendant could override it whenever its invocation concealed evidence of *some* probative value. Courts must respect the legislative judgment that in some situations the social policy underlying a privilege should require that litigants be denied access to otherwise admissible evidence. The legislative establishment of a privilege should make the privilege-holder a *disfavored source of information*." (*Defendant v. Witness, supra,* 30 Stan.L.Rev. at p. 966, italics added.)

It is no surprise that a number of courts, state and federal, have employed an alternative source rule at the threshold when weighing criminal defendants' rights against reporters' statutory or qualified First Amendment privileges. (See *United States* v. *Burke* (2d Cir. 1983) 700 F.2d 70, 77, fn. 8; *United States* v. *Cuthbertson* (3d Cir. 1981) 651 F.2d 189, 195-196; *United States* v. *Hubbard* (D.D.C. 1979) 493 F.Supp. 202, 205; *State* v. *Rinaldo* (1984) 102 Wn.2d 749 [689 P.2d 392, 395-396]; *State* v. *St. Peter* (1974) 132 Vt. 266 [315 A.2d 254, 256]; *Brown* v. *Commonwealth* (1974) 214 Va. 755 [204 S.E.2d 429, 431], cert. den. 419 U.S. 966 [42 L.Ed.2d 182, 95 S.Ct. 229]; *Matter of Farber* (1978) 78 N.J. 259 [394 A.2d 330, 338, 99 A.L.R.3d 1] [interpreting earlier, less comprehensive shield law]; *State* v. *Boiardo, supra,* 414 A.2d 14, 21 [interpreting recent, more comprehensive shield law]; *Hallissy* v. *Superior Court* (1988) 200 Cal.App.3d 1038, 1046 [248 Cal.Rptr. 635]; *Hammarley* v. *Superior Court* (1979) 89 Cal.App.3d 388, 399 [153 Cal.Rptr. 608].)

II. *Policy Considerations: Ensuring Press Autonomy*

The enforcement of an alternative-source rule is desirable for policy as well as doctrinal reasons. A comprehensive reporter's immunity provision, in addition to protecting confidential or sensitive sources, has the effect of

safeguarding "[t]he autonomy of the press." (*O'Neill* v. *Oakgrove Constr.* (1988) 71 N.Y.2d 521, 526 [528 N.Y.S.2d 1, 3 [523 N.E.2d 277, 279] [construing a similar state constitutional provision].) As the New York Court of Appeals recognized, press autonomy "would be jeopardized if resort to its resource materials by litigants seeking to utilize the news gathering efforts of journalists for their private purposes were routinely permitted [citations] . . . . The practical burden on time and resources as well as the consequent diversion of journalistic effort and disruption of news gathering activity, would be particularly inimical to the vigor of a free press." (528 N.Y.S.2d at p. 3.)

The threat to press autonomy is particularly clear in light of the press's unique role in society. As the institution that gathers and disseminates information, journalists often serve as the eyes and ears of the public. (See *Richmond Newspapers, Inc.* v. *Virginia* (1980) 448 U.S. 555, 572-573 [65 L.Ed.2d 973, 986-987, 100 S.Ct. 2814]; *Houchins* v. *KQED, Inc.* (1978) 438 U.S. 1, 17-18 [57 L.Ed.2d 553, 566-567, 98 S.Ct. 2588] (Stewart, J., conc.).) Because journalists not only gather a great deal of information, but publicly identify themselves as possessing it, they are especially prone to be called upon by litigants seeking to minimize the costs of obtaining needed information. Carte blanche access to the journalist's files would give litigants a free ride on news organizations' information-gathering efforts.

To require a threshold showing of no alternative source would discourage this misuse of the press. Our constitutional system does not ensure the exercise of a criminal defendant's rights in the least costly manner. The alternative-source rule would compel litigants to expend a reasonable amount of effort to obtain the information from nonpress sources. Only when a defendant is unable to obtain the information through these means, or when the cost of obtaining the information is prohibitive, would he be able to pierce the shield of journalistic immunity. Such a rule would maximally preserve press autonomy, as the reporter's constitutional immunity is designed to do, while still recognizing that press autonomy must ultimately give way to the criminal defendant's fair trial rights.

## III. *Alternative-source Rule and the Percipient Witness*

I concur, nonetheless, in the court's judgment because I find that the alternative-source rule is inapplicable when the information sought is the reporter's own observations as a percipient witness of a transitory event. The alternative-source rule arose in cases, such as those cited *ante,* in which the information in question had been gathered from documents, interviews, public meetings, and the like. In such cases the content of the information existed in some objective and stable form, capable of independent verification—the documents could be independently inspected, the inter-

viewees could be contacted, etc. What the defendants in those cases were primarily interested in was not the reporters' perceptions but the content of these independent information sources.

In the case of eyewitnessed transitory events, however, no such independent, stable information source exists. Equally significant is the well-established fact that there are often major discrepancies between different eyewitness accounts of the same event, owing to distortions and biases in both perception and memory. (See *People* v. *McDonald* (1984) 37 Cal.3d 351, 363-365 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011], and authorities cited; Note, *Did Your Eyes Deceive You: Expert Psychological Testimony on the Unreliability of Eyewitness Identification* (1977) 29 Stan.L.Rev. 969, 971-989.) Thus, two percipient witnesses of the same event are not in any sense fungible. And unlike the document or the interview, the transitory unrecorded event is not subject to subsequent independent verification.

Accordingly, the reporter as a percipient witness is not an "exception" to the alternative-source rule. Rather, in such situations the rule simply does not apply: in a real sense, two eyewitnesses to the same event are not alternative sources of the same information, but sources of *different* information.

In the present case, defendant was able to show a reasonable possibility that the information would assist in ascertaining the truth. Because the information he seeks from the reporters is their contemporaneous observations of a transitory event, he has met the second threshold by showing that no real alternative source of the information exists. He is therefore entitled to the reporters' testimony.

**BROUSSARD, J.,** Concurring.—

## I.

I agree with the majority opinion's conclusion that the information that defendant sought to elicit from the reporters in this case was "unpublished information" within the meaning of the California reporter's shield provision. (Cal. Const., art. I, § 2, subd. (b).) I cannot join, however, in the opinion's suggestion that it is either necessary or appropriate for the court, in reaching this conclusion, to rely solely on the "plain language" of the constitutional provision, without reference to the background or history of the constitutional provision or to the legislative history of the preceding statutory shield provision on which the constitutional provision was deliberately modeled.

In *County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841 [59 Cal.Rptr. 609, 428 P.2d 593], the defendant relied on an argument virtually identical to that embraced by the majority opinion, asserting that because the constitutional provision at issue in that case was "clear and unambiguous," the court was required to confine itself to the "plain language" of the provision and could not consider the legislative history or judicial interpretation of a related statutory provision. (*Id.* at pp. 846-847.) In *Hickman*, this court—in a unanimous opinion—explicitly rejected the argument (*id.* at pp. 847-851), explaining that " '[i]n the absence of contrary indication in a constitutional amendment, terms used therein must be construed in light of their statutory meaning or interpretation in effect at the time of its adoption.' " (*Id.* at p. 850 [quoting *Michels* v. *Watson* (1964) 229 Cal.App.2d 404 (40 Cal.Rptr. 464)].) Thus, contrary to the suggestion of the majority opinion, *Hickman* as well as many other, more recent, cases (see, e.g., *City of Sacramento* v. *State of California, ante,* 51, 67, fn. 11 [266 Cal.Rptr. 139, 785 P.2d 522]) make it clear that a court, in interpreting an initiative measure, may properly consider the statutory antecedents of the measure for any guidance those statutes may shed on the proper interpretation of the initiative provision.

In light of these authorities, I believe that it is clearly appropriate, in interpreting the constitutional reporter's shield provision, to consider the entire background of the provision, including the legislative history and judicial interpretation of Evidence Code section 1070, the statutory provision on which the constitutional shield provision was based. In my view, both the language and history of the shield provision fully support the conclusion that the provision is not limited to an undefined category of "confidential" information, but rather applies to all "unpublished information."

## II.

Although the state constitutional shield provision extends to the information elicited from the reporters in this case, I agree with all of my colleagues that, under the facts of this case, application of the shield provision to afford the reporters a state-granted immunity from contempt would improperly infringe on the defendant's federal constitutional rights. In light of the different approaches to the federal constitutional issue reflected in the majority opinion and Justice Mosk's concurring opinion, however, I thought it appropriate briefly to explain my own views on this point.

The majority opinion and Justice Mosk's concurring opinion are on common ground in concluding that, in a criminal case, a defendant's federal constitutional right to a fair trial is implicated whenever a defendant dem-

onstrates that there is a reasonable possibility that information that would assist his defense is being withheld by a reporter under the aegis of the shield provision. I, too, agree with that proposition.

The majority opinion and Justice Mosk's concurring opinion diverge, however, with respect to the proper constitutional analysis that follows such a showing by the defendant. Justice Mosk's concurring opinion concludes that once a defendant makes such a showing and demonstrates that no alternative sources for the information are available, the federal Constitution always requires the state shield provision to give way. The majority opinion, by contrast, concludes that when a defendant makes the threshold showing, the federal Constitution calls for a case-by-case weighing of the defendant's relative need for disclosure of the information, on the one hand, against the relative strength of the state's interest in permitting the reporter to withhold the information, on the other.

In general, I agree with the majority's conclusion that, in determining whether the California shield provision may be constitutionally applied in a given case, it is appropriate to weigh a defendant's relative need for the information in the particular case against the relative strength of the state's interest in affording immunity under the circumstances of that case.[1] In determining the proper scope of federal constitutional rights in other contexts, numerous cases establish that federal constitutional guaranties are generally not absolute, and may, in appropriate circumstances, accommodate state laws which further a sufficiently compelling or important state interest. (See, e.g., *Chambers v. Mississippi* (1973) 410 U.S. 284, 295 [35 L.Ed.2d 297, 309, 93 S.Ct. 1038] ["Of course, the right to confront . . . is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process."]; *Konigsberg* v. *State Bar* (1961) 366 U.S. 36, 49-51 [6 L.Ed.2d 105, 116-117, 81 S.Ct. 997] ["[W]e reject the view that freedom of speech and association . . . as protected by the First and Fourteenth Amendments, are 'absolutes' . . . . [G]eneral regulatory statutes, not intended to control the content of speech but incidentally limiting its unfettered exercise, have not been regarded as the type of law the First or Fourteenth Amendment forbade Congress or the States to pass, when they have been found justified by subordinating valid governmental interests, a prerequisite to constitutionality which has necessarily involved a weighing of the governmental interest involved. . . ."].) Particularly in view of a state's traditional authority to establish evidentiary privi-

---

[1]Although in my view it would be wiser at this point to refrain from attempting to set forth an exhaustive list of specific "factors" that must be considered by a court in every case (see maj. opn., *ante,* at p. 813), the "factors" discussed in the majority opinion appear broad enough to permit a court to take into account all relevant considerations in "balancing. . . the defendant's and newsperson's respective . . . interests." (See maj. opn., *ante,* at p. 809.)

leges to serve interests external to the adjudicatory process, it is difficult for me to see why the general principle permitting consideration of compelling state interests in the application of federal constitutional safeguards should not apply in this context as well. (Cf., e.g., *United States* v. *Nixon* (1974) 418 U.S. 683, 711-712 [41 L.Ed.2d 1039, 1066, 94 S.Ct. 3090] ["In this case we must weigh the importance of the general privilege of confidentiality of Presidential communications in performance of the President's responsibilities against the inroads of such a privilege on the fair administration of criminal justice."].)

Accordingly, in light of the important role a reporter shield provision may play in furthering a state's compelling interest in fostering and preserving a free and vigilant press, I believe that even if a reporter's "unpublished information" in a particular case may be of some assistance to the defense and there are no available alternative sources of the information, if a court finds that the defendant's need for the information is not particularly great while the state's interest in affording a reporter immunity under the circumstances is compelling, the court could properly conclude that the defendant's federal constitutional right to a fair trial would not require the state shield provision to give way.

As the majority opinion demonstrates, however, on the facts of the present case it is clear that no such overriding, compelling state interest is present. Consequently, I concur fully in the majority opinion's affirmance of the Court of Appeal judgment.

Lucas, C. J., concurred as to part I only.

The petition of real parties in interest for a rehearing was denied July 11, 1990.