**VICEROY GOLD CORPORATION, a Delaware Corporation, Plaintiff,**

v.

**Lloyd W. AUBRY, Jr., as Director of the Department of Industrial Relations for the State of California, and Victoria Bradshaw, as Labor Commissioner for the State of California, in their Official capacities only; and California State Department of Industrial Relations, Division of Labor Standards Enforcement, inclusive, Defendants.**

**No. C–93–4116–VRW.**

United States District Court, N.D. California.

July 21, 1994.

Miles E. Locker, State of California, Dept. of Indus. Relations, Div. of Labor Standards Enforcement, Legal Section, San Francisco, CA, for defendants.

Charles S. Birenbaum, Scott L. Gardner, Thomas M. McInerney, Thelen, Marrin, Johnson & Bridges, San Francisco, CA, for plaintiff.

## ORDER

WALKER, District Judge.

Plaintiff Viceroy Gold Corporation ("Viceroy") operates a gold processing facility in San Bernardino County called the Castle Mountain Mine ("Castle Mountain"). Castle Mountain is a non-union mine employing workers who operate equipment to recover gold ore from rock. The ore processing is performed by complex machinery utilizing a substantially automated procedure. Witt Decl in Supp at ¶¶ 4–6.

Castle Mountain operates twenty-four hours a day, seven days a week, using rotating shifts. The mine workers currently work eight-hour shifts and forty-hour work weeks. Because housing near the facility is limited, many of the mine workers commute seventy-five miles or more to the mine from Las Vegas, Nevada and its environs. Many workers spend three hours a day commuting to and from work on highways that are narrow and unsafe. During the last two years, two employees of Castle Mountain sub-contractors died in auto accidents during their commutes. Witt Decl in Supp at ¶ 10.

The vast majority of Viceroy's employees at Castle Mountain have expressed dissatisfaction with the eight-hour work day; they prefer twelve-hour shifts. In October 1992, thirty-two out of thirty-two employees involved in a secret ballot vote elected to switch to a twelve-hour work shift. Witt Decl in Supp at ¶ 21. Twelve-hour shifts would reduce work weeks from five to four days. With a four-day work week, mine workers at Castle Mountain would reduce total commuting times and be able to spend more time with their families and in other pursuits.

Although Viceroy is willing to implement twelve-hour work shifts, the State of California's Division of Labor Standards Enforcement ("DLSE") has prohibited Viceroy's workers from working shifts longer than eight hours. DLSE bases its prohibition upon Cal Labor Code sections 750 and 750.5. Section 750 was enacted in 1909 and states, in pertinent part:

The period of employment shall not exceed eight hours within any twenty-four hours and the hours of employment shall be consecutive * * * for all persons who are employed or engaged in work in:

(a) Underground mines or underground workings.

(b) Smelters and plants for the reduction or refining of ores or metals.

Cal Lab Code § 750. In 1983, the California Legislature amended section 750 by adding section 750.5. That provision created an exception to the eight-hour shift limitation mandated by section 750:

The provisions of Section 750 shall not prohibit a period of employment up to 12 hours within a 24–hour period when the employer and a labor organization representing employees of the employer have entered into a valid collective-bargaining agreement where the agreement expressly provides for the wages, hours of work, and working conditions of the employees.

Cal Lab Code § 750.5.

The DLSE held that the Castle Mountain facility was a plant "for the reduction or refining of ores and metals" covered by section 750. Because Castle Mountain is not a unionized mine, the DLSE ruled that the exception created by section 750.5 for workers covered by a "valid collective bargaining agreement" did not apply. Viceroy was therefore barred from implementing work shifts in excess of eight hours.

According to Viceroy, the eight-hour shift limitation has led to severe employee morale problems at Castle Mountain and has caused at least two employees to quit their jobs at the mine. Additionally, Viceroy claims that section 750.5 puts Castle Mountain at a competitive disadvantage against in-state unionized mines and nearby mines located in Nevada in recruiting qualified mine workers because those mines can schedule longer shifts for their employees. After making two unsuccessful attempts to convince the DLSE to allow Viceroy to implement longer shifts, Viceroy filed this action against various state labor officials and the California State Department of Industrial Relations, Division of Labor Standards Enforcement (collectively referred to as the "state") for declaratory and injunctive relief.

The complaint alleges six grounds for relief:

(1) as a matter of legislative intent and statutory construction, section 750 was not meant to apply to modern facilities like Castle Mountain;

(2) section 750.5 is preempted by the National Labor Relations Act ("NLRA"), 29 USC §§ 151, et seq, as amended, under the principle enunciated in *Machinists v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976);

(3) section 750.5 is preempted by the NLRA under the principle articulated in *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959);

(4) section 750.5 is preempted by section 301 of the Labor Management Relations Act ("LMRA"), 29 USC §§ 141, et seq. as amended;

(5) section 750.5 is preempted by the Employee Retirement Income Security Act ("ERISA"), 29 USC §§ 1001, et seq.; and

(6) section 750.5 violates the Equal Protection Clause of the United States Constitution.

Viceroy's first claim seeks to escape the eight-hour shift limitation altogether. The other five claims specifically attack the validity of the section 750.5 union exception to the eight-hour shift limitation created by section 750.

Viceroy now moves for summary judgment on all of its claims for relief. The state cross-moves for summary judgment on Viceroy's ERISA and LMRA preemption claims. The parties agree that these motions are based solely upon questions of law. For convenience, the court addresses the state's motion for summary judgment on Viceroy's LMRA and ERISA preemption claims before taking up Viceroy's motions. In connection with the latter, of course, the court will first consider Viceroy's standing to assert the claims at issue and then address the merits of those claims.

As will be discussed below, the court ultimately concludes that the section 750.5 union exception to the general eight-hour limitation on mine work-shifts cannot be reconciled with federal labor law because it burdens mine workers' NLRA rights freely to choose between unionization and non-unionization. Section 750.5 must therefore be preempted by the NLRA under the *Machinists* doctrine.

The court's ruling, however, has no impact on the general eight-hour shift limitation of section 750, which remains operative. In essence, the court's invalidation of the section 750.5 union exception has the practical effect of reinstating the eight-hour shift limitation on union mine workers. Non-unionized mine workers, including Viceroy's employees, continue to be prohibited by section 750 from working shifts greater than eight hours.

This outcome may not completely satisfy any party or unionized mine workers in California. Nevertheless, it harmonizes the conflicting legal principles at issue in this case. The NLRA prohibits a state from conferring state benefits in a manner creating substantial incentives for employees to unionize or not to unionize. Because the section 750.5 union exception to the general eight-hour shift limitation of section 750 does just that, it is preempted. The less than desirable practical consequences of this outcome must be dealt with—if at all—by the California legislature.

## I

The parties both move for summary judgment on Viceroy's LMRA and ERISA preemption claims. The court will address these cross-motions first.

## A

■ The parties cross-move for summary judgment on Viceroy's claim that section 301 of the LMRA, 29 U.S.C. § 185(a), preempts section 750.5. Section 301 states, in relevant part:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce * * * may be brought in any

district court of the United States having jurisdiction of the parties * * *.

29 U.S.C. § 185(a). The scope of federal preemption under section 301 is defined in several key Supreme Court cases. In *Teamsters v. Lucas Flour Co*, 369 U.S. 95, 103–04, 82 S.Ct. 571, 576–77, 7 L.Ed.2d 593 (1962), the Court held that "a suit in state court alleging a violation of a provision of a labor contract must be brought under § 301 and be resolved by reference to federal law." *Allis–Chalmers Corp v. Lueck*, 471 U.S. 202, 210, 105 S.Ct. 1904, 1910–11, 85 L.Ed.2d 206 (1985) (explaining *Lucas Flour*). In *Allis–Chalmers*, an employee brought a state law tort action against an employer for bad faith delay in handling benefits payable under a collective bargaining agreement. The Court held the state-tort bad faith breach action was preempted because it "purport[ed] to define the meaning of the contract relationship" between the parties and was "inextricably intertwined" with the interpretation of the collective bargaining agreement. Id. at 213, 105 S.Ct. at 1912. "[Q]uestions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort." Id at 211, 105 S.Ct. at 1911. In essence, the *Allis–Chalmers* Court held that the employee's tort claim was for enforcement of the terms of a labor contract. The state tort claim was therefore preempted by § 301.

■ Collectively, *Lucas Flour* and *Allis–Chalmers* require contract disputes involving collective bargaining agreements and the interpretation of collective bargaining agreements to be resolved by reference to uniform federal labor law. The purpose of section 301 preemption is to ensure uniformity and predictability in the collective bargaining process. *Lucas Flour*, 369 U.S. at 103–104, 82 S.Ct. at 576–77; *Allis–Chalmers*, 471 U.S. at 211, 105 S.Ct. at 1911.

Viceroy claims section 750.5 is preempted by section 301 of the LMRA. Citing *Allis–Chalmers*, Viceroy argues that because the section 750.5 union exception only applies to

workers covered by a "valid collective bargaining agreement," the state's application of that exception is "inextricably intertwined" with the terms of a collective bargaining agreement. Viceroy's reliance on LMRA preemption is misplaced.

By its express terms, section 301 only applies to "[s]uits for the violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." 29 U.S.C. § 185. Unlike *Allis Chalmers* and *Lucas Flour*, this suit is *not* one for enforcement of the terms of a collective bargaining agreement. In this suit, Viceroy seeks to invalidate a state statute allegedly conferring a benefit on unionized mines and mine workers unavailable to non-unionized mines and mine workers. As the court noted above, section 301 preemption ensures that rights bargained for under the federally established collective bargaining process will be consistently interpreted and not subjected to different interpretations by the states. This federal interest in uniformity of labor contract interpretation has no application to Viceroy because Viceroy does not have a collective bargaining agreement to interpret.

Accordingly, Viceroy's LMRA preemption claim fails as a matter of law. The state's motion for summary judgment on Viceroy's section 301 preemption claim is hereby **GRANTED** and Viceroy's motion for summary judgment on that claim is hereby **DENIED.**

### B

■ Viceroy also claims section 750.5 is preempted by ERISA. That comprehensive federal statute is "designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc,* 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983). Pursuant to 29 U.S.C. § 1144, ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan * * *." Section 750.5 grants an exception to the eight-hour shift limitation of section 750 to workers covered by a "valid collective-bargaining agreement where the agreement expressly provides for the wages, hours of work, and working conditions of the employees." Viceroy claims the requirement that the collective bargaining agreement provide for "working conditions of the employees" necessarily relates to employee benefit plans and therefore implicates ERISA preemption. Even if there were some merit to this strained interpretation of section 750.5 and ERISA, Viceroy lacks standing to bring a claim of ERISA preemption.

■ It is axiomatic that unless plaintiff has standing to sue under Article III of the United States Constitution, there can be no case or controversy cognizable in the federal courts. See *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). To have standing, a plaintiff must first show injury-in-fact which is "actual or imminent, not 'conjectural' or 'hypothetical.'" *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990).

Viceroy has no standing to claim ERISA preemption here because there is absolutely no evidence that the state interprets or enforces section 750.5 in a way that impacts employee benefit plans in any manner. The "working conditions of the employees" language of section 750.5 does not necessarily implicate employee benefit plans on its face. Sections 750 and 750.5 were ostensibly enacted to ensure mine worker safety. Thus, the requirement in section 750.5 of a collective bargaining agreement providing for "working conditions of the employees" likely refers to a labor contract covering worker safety and working environment, not employee benefit plans. Without some showing that the state has or is likely to enforce section 750.5 in a way that relates to the administration of employee benefit plans or Viceroy's other rights under ERISA, Viceroy simply cannot establish injury-in-fact sufficient to create Article III standing for an ERISA preemption claim. Viceroy fails to make such a showing here and therefore lacks standing to pursue its preemption claim under ERISA. Accordingly, the state's cross-motion for summary judgment on Viceroy's ERISA preemption claim is hereby **GRANTED.** Viceroy's motion for summary judgment on that claim is hereby **DENIED.**

## II

Viceroy moves for summary judgment on its remaining claims. The state challenges Viceroy's standing to assert NLRA preemption, opposes all of the claims on res judicata grounds and opposes each of Viceroy's claims on the merits. Because standing is a fundamental requirement for Viceroy to obtain relief, the court first turns to that issue.

### A

■ The state argues that Viceroy lacks standing to bring preemption claims under the NLRA. According to the state, Viceroy's NLRA claims fail because they assert the rights of Viceroy's employees, third-parties to the litigation. The state's standing challenge is unpersuasive.[1]

■ As noted above, the court must make a threshold determination of standing under Article III of the United States Constitution in every federal case. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The standing question focuses on whether the plaintiff has alleged a sufficient "personal stake in the outcome" to ensure "concrete adverseness." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

■ "The doctrine of standing is comprised both of constitutional or 'Article III' requirements and of 'prudential considerations.'" W W Schwarzer, A W Tashima & J Wagstaffe, Federal Civil Procedure Before Trial, § 2:1205 (1993). At a minimum, plaintiff must satisfy the three "separate but interrelated" limitations of Article III: (1) there must be a distinct and palpable injury to the plaintiff, (2) there must be a fairly traceable causal connection between that injury and the challenged conduct of the defendant; and (3) there must be a "substantial likelihood" that the relief requested will redress or prevent the injury. *McMichael v. County of Napa,* 709 F.2d 1268, 1269–70 (9th Cir.1983).

■ At least three "prudential" standing principles have also been recognized: (1) the plaintiff must assert his own rights and cannot rest his claim to relief on the legal rights or interests of third parties; (2) the plaintiff's injury must not be shared in substantially equal measure by all or a large class of citizens rendering it a generalized grievance not normally appropriate for judicial resolution; and (3) the plaintiff's interest must arguably be within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question. Id. These prudential limitations are "balanced on a case-by-case basis in determining whether granting standing would be appropriate." Schwarzer at § 2:1210 (citing *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc,* 454 U.S. 464, 475, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982)).

As a preliminary matter, the court notes that Viceroy has satisfied the minimum Article III standing requirements. First, Viceroy alleges direct injury to itself as a result of the state's enforcement of sections 750 and 750.5. Viceroy does not want to unionize Castle Mountain. If the mine unionizes, Viceroy will presumably lose the efficiencies and other advantages of operating a non-union mine. Furthermore, the eight-hour shift limit and the union exception to that limit has allegedly had an adverse effect on Viceroy's Castle Mountain facility: decreased employee morale, lowered worker productivity, employee attrition and recruiting difficulties. All of these jeopardize Viceroy's ability to operate its mining venture.

Viceroy's injury is further amplified by the fact that unionized mines in Viceroy's industry are not subject to the same eight-hour limitation and therefore do not have to operate under the same adverse conditions that currently plague Viceroy. Viceroy is placed at a serious competitive disadvantage relative to those unionized mines. See *Associated Builders & Contractors v. Baca,* 769 F.Supp. 1537, 1542 (N.D.Cal.1991) (holding that re-

---

1. The State's more specific challenge to Viceroy's standing to bring a claim of ERISA preemption was addressed above in Section I B.

duced competitiveness in the industry constitutes injury-in-fact).

Viceroy also claims it is being injured by the pressure to unionize created by sections 750 and 750.5. The state's enforcement of those provisions forces Viceroy either to become unionized to obtain the benefit of work shifts in excess of eight hours or forego unionizing and be placed at a serious competitive disadvantage. To the extent it is not in Viceroy's interest to unionize, Viceroy is injured by the pressures to unionize created by sections 750 and 750.5.

Second, the causal connection requirement for Article III standing is also satisfied, because Viceroy's alleged injuries stem directly from the state's enforcement of sections 750 and 750.5. For example, over seventy Castle Mountain mine workers signed a declaration stating that their inability to work longer shifts has decreased employee morale and productivity. Pl's Decls In Supp at Ex 3, ¶¶ 2–3. Viceroy, no less than its employees, is hurt by decreased worker morale and productivity.

Third, Viceroy's injuries will likely be redressed, in part, or in whole, by a favorable decision in this case. As the court noted above, Viceroy seeks a judicial declaration, based on an analysis of legislative intent, that the eight-hour shift limit for workers in "plants for the reduction or refining or ores or metals" mandated by section 750 does not apply to modern facilities like Castle Mountain. Such a declaration would allow Viceroy to avoid the eight-hour prohibition of section 750 and implement longer work shifts. The added flexibility in scheduling workers will alleviate employee morale problems and make Viceroy more competitive with unionized mines.

Alternatively, Viceroy advocates striking down section 750.5 based on three remaining claims (two of the original five claims targeted against section 750.5 were resolved against Viceroy in Section I above). While invalidation of section 750.5 would not relieve Viceroy from the eight-hour shift limitation of section 750, it would take away the advantage unionized mines have over Viceroy in maintaining employee morale and productivity and recruiting mine workers. Viceroy

would also be relieved from some of the pressures to unionize. Because Viceroy can achieve some measure of relief under each of its remaining claims, Viceroy satisfies the "redressibility" requirement for Article III standing.

Based on the analysis above, Viceroy has Article III standing to assert any NLRA claims based on its own rights. Viceroy's *Machinists* preemption claim, however, relies in part, on the rights of its third-party employees freely to join or not to join a union. Because of this, the state invokes the first prudential limitation to challenge Viceroy's standing to bring that claim. The state argues that Viceroy should be denied standing to assert federal preemption based on the NLRA rights of third-party employees. The court is unpersuaded.

The purpose of the general prohibition against asserting third-party rights is two-fold: (1) to avoid adjudicating rights a third-party may not wish to assert; and (2) to ensure effective advocacy ("third parties * * * usually will be the best proponents of their own rights"). *Singleton v. Wulff*, 428 U.S. 106, 113–14, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1976). As the court noted above, however, the prudential limitation that is the basis of the state's argument is not mandatory. The general rule against asserting third-party rights "should not be applied where its underlying justifications are absent." Id at 114, 96 S.Ct. at 2874. Two factors often considered by the Supreme Court to determine whether to apply the rule are: (1) whether the third-party's "enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue"; and (2) "the ability of the third party to assert his own rights." Id at 114–16, 96 S.Ct. at 2874.

Under the circumstances of this case, Viceroy has standing to assert its employees' NLRA rights freely to join or not to join a union. First, there is little risk of unnecessary litigation of third-party rights here. Most, if not all of Viceroy's employees seek to assert their NLRA rights through Viceroy in this litigation. Although they are not named plaintiffs in this case, the employees

have joined in a group declaration or submitted individual declarations complaining of the disparate treatment of unionized and non-unionized mine workers under sections 750 and 750.5. Pl's Decls in Supp Ex 3 at ¶ 4, Ex 4–12. At least six individual employees submitted declarations stating: "I want the right to work the same hours regardless of whether I decide to engage in Union activity or to refrain from Union activity." Pl's Decls in Supp Ex 7 at ¶ 8, Ex 8 at ¶ 9, Ex 9 at ¶ 9, Ex 10 at ¶ 9, Ex 11 at ¶ 7, Ex 12 at ¶ 9. If Viceroy succeeds in striking down section 750.5, its employees' NLRA rights to choose between unionization and non-unionization free from state-imposed limitations will be vindicated. The employees' enjoyment of their NLRA rights is therefore "inextricably bound up" with Viceroy's chosen course of action. *Singleton*, 428 U.S. at 114–15, 96 S.Ct. at 2874.

The nature of Viceroy's relationship with its mine workers also supports Viceroy's ability adequately to represent its employees' interests. Id at 115, 96 S.Ct. at 2874 ("the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter"). Viceroy's employer-employee relationship with its mine workers is plainly a symbiotic one. The well-being of its employees depends in large part on the well-being of Viceroy, and vice-versa. While each has some unique interests, and of course there are obvious tensions in this relationship, one powerful shared interest is their mutual desire not to have the state dictate the collective bargaining status of Castle Mountain. Because Viceroy's interest is sufficiently aligned with its employees on this issue, Viceroy is an adequate advocate of its employees' NLRA rights freely to join or not to join a union.

There is also a genuine obstacle to the employees' abilities to assert their NLRA rights. Castle Mountain employees likely do not have sufficient individual economic stakes to motivate them to bring suit for vindication of their NLRA rights. Almost all of the employees are residents of Nevada. Because Nevada mines may implement longer work shifts, it is likely easier for a Castle Moun-

tain employee simply to switch employment to a Nevada mine rather than incur the substantial cost and inconvenience of litigating a judicial challenge to section 750.5 in court. The fact that a challenge to a California statute, for jurisdictional and venue reasons, would likely have to be brought in California, rather than Nevada, makes the prospect of litigation even more daunting to the employees.

In contrast, Viceroy is in an excellent position to litigate its employees' NLRA rights effectively. Viceroy is located in California and is therefore closer to the litigation from a geographical standpoint. More importantly, Viceroy has the financial and organizational resources to pursue this case in the most effective manner. Viceroy has easy access to a wealth of administrative and employment files that might not otherwise be available or known to individual employees. Also, by virtue of its status as an employer, Viceroy has the unique ability to utilize Castle Mountain management and internal communications to mobilize support for the litigation from all mine workers interested in protecting their NLRA rights. The large number of individual and group declarations from Castle Mountain managers, employees and former employees filed by Viceroy in support of its motion are just some of the fruits of Viceroy's centralized efforts. It is unlikely that the mine workers themselves could have advocated their case any more effectively than Viceroy has.

For the above reasons, it is appropriate to allow Viceroy to assert its employees' NLRA right freely to join or not to join a union. Viceroy has standing to bring its *Machinists* preemption claim based on its employees' freedom of choice.

B

■ The state also argues that Viceroy's claims are barred by the doctrine of res judicata. Viceroy has been a member of the California Mining Association ("CMA") since the late 1980's. In 1990, CMA challenged sections 750 and 750.5 in *Sonora Mining Co and California Mining Association v. DLSE*, San Francisco Superior Court, Case No. 919852. In that case, CMA asked the

court to "interpret Labor Code [§] 750.5 to allow non-union miners * * * the exemptions available under Labor Code section 750.5" and declare that the DLSE's interpretation "that Section 750.5 applies only to union employees is invalid and that SMC and other members of CMA have no legal duty to comply with this interpretation." Locker Decl in Opp at Ex A, pp 7–8. On July 18, 1991, the *Sonora* court granted summary judgment in favor of the DLSE, stating:

> The Court holds that there is no collective bargaining agreement covering the mill and plant employees of Sonora Mining Company (SMC). Consequently, SMC's mill and plant employees are prohibited from working more than eight hours in any 24–hour period pursuant to Labor Code § 750. The petitions signed by SMC employees which request implementation of 12–hour work schedules do not meet the requirements for the exemption from Labor Code § 750 as provided by Labor Code § 750.5. In order to qualify for the exemption under Section 750.5, there must be a valid collective bargaining agreement between the employer and a labor organization representing the employees of the employer which expressly provides for the wages, hours of work, and working conditions of the employees.

Id at Ex D. The state argues that this final judgment rendered against CMA in *Sonora* precludes Viceroy, a CMA member at the time, from re-litigating those claims in this case.

■ Under the doctrine of res judicata, a final judgment on the merits bars the parties or their privies from re-litigating claims which were litigated or could have been litigated in the prior action. *Brown v. Felsen*, 442 U.S. 127, 131, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767 (1979). "What persons are bound by a valid [state court] judgment is determined, subject to constitutional law, by the local law of the State where the judgment was rendered." *General Foods Corp v. Mass Dep't of Public Health,* 648 F.2d 784, 786 (1st Cir 1981); *McDonald v. City of West Branch, Mich,* 466 U.S. 284, 287, 104 S.Ct. 1799, 1801, 80 L.Ed.2d 302 (1984); *Ross v.*

*Int'l Bd of Elec Workers,* 634 F.2d 453, 457 (9th Cir.1980); 28 U.S.C. § 1738.

■ In California, the preclusive effect of a state court judgment is governed by Cal. Civ.Proc.Code § 1908, which states:

> (a) The effect of a judgment or final order * * *
>
> > (1) * * * is, in respect to the matter directly adjudged, conclusive between the parties and their *successors in interest* * * * litigating for the same thing under the same title and in the same capacity, provided they have notice, actual or constructive, of the pendency of the action or proceeding.
>
> (b) A person who is not a party but who *controls* an action, individually or in cooperation with others, is bound by the adjudications of litigated matters * * *.

Cal.Civ.Proc.Code § 1908 (emphasis added). Thus, successors in interest and non-parties that control the litigation are bound by final judgments rendered in California state court.

The state does not contend that Viceroy is a "successor in interest" to the *Sonora* action. Moreover, Viceroy is not a controlling non-party to that litigation. The record shows that Viceroy did not participate in, offer advice to the parties or contribute any funds to that litigation. Witt Decl in Supp at ¶ 19. Viceroy did not in any way authorize CMA to represent Viceroy in the *Sonora* litigation, nor did Viceroy have an opportunity to vote on CMA's participation in that case. Id. Moreover, Viceroy had no apparent interest in the *Sonora* action because Viceroy had no California employees at the time that case was litigated. Id. Because Viceroy had no concrete interest in *Sonora* and had no control over the litigation of that case, Viceroy is not barred under Cal.Civ. Proc.Code § 1908 from litigating its claims in this action.

The state contends that Viceroy, *solely by virtue of its membership in CMA,* is bound by the *Sonora* judgment. This argument conflicts with the plain language of Cal.Civ. Proc.Code § 1908 which states only that successors in interest and non-parties that "control" a prior action will be bound. CMA members such as Viceroy that do not fall

within those two categories of preclusion will not be barred from litigating their claims in a subsequent proceeding.

■ Even under federal law, mere membership in a trade association, without more, will not make a member privy to all federal litigation undertaken by the association. A final judgment in federal court against a trade association will not be res judicata against a member unless the member authorized the litigation in some way, see, e.g., *Expert Electric, Inc v. Levine*, 554 F.2d 1227, 1233 (2d Cir 1977) (finding privity between multi-employer bargaining association and its members because the association was "the body vested with representative authority."); *General Foods*, 648 F.2d at 788 (members implicitly authorized trade association to represent them in prior action by partially financing the litigation), or participated in or controlled the prior litigation in some fashion, see, e.g., *Crane v. Commissioner*, 602 F.Supp. 280, 287 (D.Me.1985) (citing *Montana v. United States*, 440 U.S. 147, 151, 99 S.Ct. 970, 972, 59 L.Ed.2d 210 (1979)). Under federal law, mere membership in a trade association does not create the privity necessary to bind the member to a judgment against an association.

Accordingly, the court rejects the state's res judicata argument.

## C

Having determined that Viceroy is entitled to pursue its remaining claims, the court now turns to the merits of those claims.

### 1

■ Viceroy first claims that the state's enforcement of section 750 against modern mining facilities such as Castle Mountain contravenes the underlying legislative intent of the statute and is thus invalid. Section 750 was enacted by the California Legislature in 1909. Viceroy cites *In re Fred J. Martin*, 157 Cal. 51, 54–57, 106 P. 235 (1909) for the proposition that the original purpose behind the statute was to limit work hours to ensure the health and safety of mine and smelter workers. In 1909, such protection was necessary because mine workers were "frequently subjected to foul atmosphere and a very high temperature, or to the influence of noxious gases, generated by the processes of refining and smelting." Id.

According to Viceroy's declarations, the working conditions that existed in 1909 are not present at Castle Mountain. The mining processes utilized at Castle Mountain are substantially automated and computerized. See Witt Decl in Supp at ¶¶ 4–7. Employees have little exposure to the actual mining processes and are protected by modern ventilation and dust controls. Id at ¶ 7. Viceroy contends the state's enforcement of section 750 against Castle Mountain is manifestly inconsistent with the original purpose of the statute and is therefore invalid. In essence, Viceroy seeks a judicial declaration that changed circumstances in the mining industry have abrogated the usefulness of section 750. While Viceroy has made a considerable showing of changed circumstances, the court is unpersuaded that this supplies the predicate for judicial action.

■ Under California law, statutory construction begins with the language of the statute itself. See *Delaney v. Superior Court*, 50 Cal.3d 785, 268 Cal.Rptr. 753, 759, 789 P.2d 934, 938 (1990). If the language of the statute is clear and unambiguous, the statutory analysis ends. Id. There is no further need to delve into legislative history. Id.

Section 750 is clear on its face. It prohibits all workers in "plants for the reduction or refining of ores or metals" from working more than eight hours a day. Cal.Lab.Code § 750. The statute makes no exceptions for modernized or extraordinarily safe mines. The sole exception to section 750 is set forth at section 750.5. Under that provision, only employees covered by a "valid collective bargaining agreement [which] expressly provides for the wages, hours of work, and working conditions of the employees," are exempt from the eight-hour shift limitation. Cal.Lab.Code § 750.5.

It is undisputed that Castle Mountain is a plant "for reduction or refining of ores or metals." See Cal.Lab.Code § 750. Moreover, Castle Mountain mine workers do not qualify for the section 750.5 exception be-

cause they are not protected by a sufficient "valid collective bargaining agreement." Cal.Labor Code § 750.5. Thus, under the plain and unambiguous language of section 750, Viceroy is prohibited from implementing shifts for its Castle Mountain mine workers longer than eight hours.

Nevertheless, Viceroy invites the court to disregard the express language of section 750 to avoid the "absurdities" caused by changed circumstances in the mining industry. See *Disabled and Blind Action Committee of Calif. v. Jenkins,* 44 Cal.App.3d 74, 118 Cal. Rptr. 536, 541 (1975); *County of Sacramento v. Hickman,* 66 Cal.2d 841, 59 Cal.Rptr. 609, 614 n. 6, 428 P.2d 593, 598 n. 6 (1967). The court declines this invitation.

▮ Modification of a statute made obsolete by virtue of changed conditions is a legislative, not a judicial prerogative. See *Naismith Dental Corp. v. Board of Dental Examiners,* 68 Cal.App.3d 253, 137 Cal.Rptr. 133 (1977). In *Palermo v. Stockton Theatres, Inc.,* 32 Cal.2d 53, 63, 195 P.2d 1 (1948) the California Supreme Court stated this rule clearly: " * * * in the absence of a constitutional objection it is generally held that the courts have no right to declare a statute obsolete by reason of a supervening change in the conditions under which it was enacted. [citations omitted]."

The viability of section 750 in light of changed work conditions in the mining industry should be evaluated by the California Legislature, not by this court. The state legislative body has access to substantial fact-finding resources unavailable to the court and is in the best position to evaluate its own labor statutes based upon available data and the numerous competing public and private interests at stake. It would simply be presumptuous for this federal court to act by judicial fiat to rewrite section 750 for the greater good of the State of California. The proper forum for Viceroy's "changed conditions" argument is the California Legislature, and not here.

For these reasons, the court rejects Viceroy's legislative intent/changed circumstances argument and **DENIES** its motion for summary judgment on that ground. The state is invited to move for summary judgment on this statutory construction claim.

2

Alternatively, Viceroy attacks the validity of the section 750.5 union exception to the eight-hour shift limitation on NLRA preemption grounds and under the Equal Protection Clause of the United States Constitution. Viceroy claims section 750.5 is preempted by the NLRA under the *Machinists* and *Garmon* doctrines. It also claims that section 750.5 violates the Equal Protection Clause because it discriminates against non-union employers of mine workers. Because Viceroy prevails as a matter of law on its claim of *Machinists* preemption, the court declines to rule on the *Garmon* preemption and equal protection claims.

▮ Under the Supremacy Clause, U.S. Const., Art. VI, cl. 2, states are prohibited from enacting and enforcing laws that conflict with federal statutes or interfere with the accomplishment of their purposes. *Louisiana Public Service Comm'n. v. FCC,* 476 U.S. 355, 368, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986). If an act of Congress does not contain an express preemption provision (such as the NLRA), preemption may still be implied if the scheme of federal regulation is so pervasive, or the federal interest is so overriding that it must be assumed Congress did not intend it to be supplemented by the states. *Pacific Gas & Elec. v. Energy Resources Comm'n.,* 461 U.S. 190, 203–04, 103 S.Ct. 1713, 1721–22, 75 L.Ed.2d 752 (1983). Even where Congress has not occupied a field completely, a state regulation is preempted to the extent it conflicts with federal law. Id at 204, 103 S.Ct. at 1722. A conflict arises if the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id.

▮ The Supreme Court has articulated two separate NLRA preemption principles. The first is so-called *Garmon* preemption. See *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). Under the *Garmon* rule, "States may not regulate activity that the NLRA protects, prohibits, or arguably

protects or prohibits." *Wisconsin Dept. of Industry v. Gould, Inc.*, 475 U.S. 282, 286, 106 S.Ct. 1057, 1061, 89 L.Ed.2d 223 (1986). The purpose of the *Garmon* rule is "to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of the 'integrated scheme of regulation' established by the NLRA." *Golden State Transit Corp. v. Los Angeles*, 475 U.S. 608, 613, 106 S.Ct. 1395, 1398, 89 L.Ed.2d 616 (1986). Thus, the *Garmon* doctrine protects the "primary jurisdiction" of the Board. *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 748, 105 S.Ct. 2380, 2394, 85 L.Ed.2d 728 (1985).

 The second type of NLRA preemption, known as *Machinists* preemption, see *Machinists v. Wisconsin Employment Relations Comm'n.*, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976), "protects against state interference with policies implicated by the structure of the [NLRA] itself, by pre-empting state law and state causes of action concerning conduct that Congress intended to be unregulated." *Metropolitan*, 471 U.S. at 749, 105 S.Ct. at 2394. The *Machinists* doctrine was initially designed to govern preemption issues not covered under the *Garmon* rule. Id. It is under the *Machinists* rule that the court holds section 750.5 preempted by the NLRA.

Viceroy argues the imposition of the eight-hour shift limitation on non-union mine workers, but not on unionized mine workers, penalizes employees who have chosen not to unionize. Because section 750 and 750.5 mandate that a private employer of mine workers recognize a labor organization and enter into a collective bargaining agreement before the employer may allow its mining employees to work *any* overtime, those provisions arguably interfere with the collective bargaining process and labor rights established by the NLRA. According to Viceroy, section 750.5 is effectively governmental encouragement of unionization prohibited under the *Machinists* doctrine. The court agrees.

The boundaries of NLRA preemption under the *Machinists* doctrine are defined in a number of Supreme Court and Ninth Circuit cases. In *Machinists*, an employer filed a complaint with a Wisconsin labor agency alleging a union's refusal to work overtime was unfair competition under Wisconsin law. The Supreme Court held that the union's conduct was not subject to state regulation because it fell within an area that Congress meant to leave unregulated, controlled only by the free play of economic forces. *Machinists*, 427 U.S. at 148–51, 96 S.Ct. at 2556–2558. The union's use of economic pressure was deemed "part and parcel of the process of collective bargaining." Id at 149, 96 S.Ct. at 2557. The state's attempt to take away an economic weapon that Congress meant for the union to have was an impermissible intrusion into the collective bargaining process and therefore preempted. Id at 150, 96 S.Ct. at 2558.

In *Golden State Transit*, the Supreme Court held that a municipality could not try to force a taxi company to settle its labor dispute with its union by withholding renewal of the company's franchise agreement with the city. The Court noted that "[f]ederal law intended to leave the employer and the union free to use their economic weapons against one another." *Golden State Transit*, 475 U.S. at 618, 106 S.Ct. at 1401. The Court held that a state could not intrude into that zone of free bargaining by conditioning the conferral of a state benefit in a way that restricts an employer's federal right to withstand a strike. Id.

Using the principles articulated in *Machinists* and *Golden State Transit*, the Ninth Circuit recently recognized that "a state's denial to union employees of benefits it grants nonunion employees may infringe on the union employees' rights under the NLRA." *McCollum v. Roberts*, 17 F.3d 1219, 1221 (9th Cir.1994). In *McCollum*, the Ninth Circuit found an Oregon statute requiring employers to provide certain rest periods to non-union employees, but not to union employees preempted under the *Machinists* doctrine because the statute impermissibly burdened the union employees' collective bargaining rights under the NLRA. Id at 1223.

Under the court's reading of the case, *McCollum* establishes a rule preventing states from passing laws that interfere with a worker's freedom to choose or not choose to

join a union. Section 7 of the NLRA protects the rights of employees to "form, join, or assist labor organizations * * * and * * * to refrain from any or all of such activities * * *." 29 U.S.C. § 157. Section 8 of the NLRA prohibits employers and labor organizations from interfering with employee rights protected under section 7 of the statute. 29 U.S.C. § 158. These provisions clearly evince a congressional intent to protect a worker's right freely to choose between unionization and non-unionization.

A state law that discriminates between union and non-union employees in conferring benefits creates incentives to join or not to join a union and therefore burdens an employee's NLRA rights to choose freely between the two options. A state could use discriminatory benefits laws effectively to control an employee's choice to unionize or not to unionize. Thus, the right to freedom of choice protected by the NLRA would not have meaning unless that freedom is deemed privileged against state regulation. For that reason, Congress must have intended to leave an employee's choice to join or not to join a union free from state interference. See *Machinists*, 427 U.S. at 141, 145, 96 S.Ct. at 2553, 2555 ("Congress meant to leave some activities unregulated and to be controlled by the free play of economic forces"). State laws burdening that choice must be preempted under *Machinists*. See *McCollum*, 17 F.3d at 1222 ("if a state steers clear of unions while handing out benefits * * * then it opens itself up to charges of anti-union discrimination, * * * a prohibited activity under the NLRA").

There is little doubt that section 750.5 confers a benefit upon union mine workers not available to non-union mine workers. That provision exempts unionized mine workers from the eight-hour shift limitation of section 750 imposed on other (non-unionized) mine workers. Freed from the limitations of section 750, unionized mine employees have flexibility to schedule longer work shifts and work less days each week.

The legislative history of section 750.5 describes the California Legislature's intent to benefit unionized mine employers and workers. AB 731, which ultimately became sec-

tion 750.5, was enacted in 1983 as an urgency measure. Section 2 of the bill explains the urgent need for a union exception to the general eight-hour shift limitation on mine workers: "[t]he economic viability of mining and mining related employment has been limited in certain instances due to the lack of authority by employers and employee representatives to determine hours and conditions of employment." Locker Decl at Ex C. The staff comments to the bill state that the bill "is aimed at giving more flexibility to both labor and management in shaping work hours" and cites a situation in which "a large California mine, not currently in operation, would like to resume mining but maintains that the eight hour day restriction makes renewed operations uneconomical." Id. In a press release, Assemblyman Richard E. Floyd heralded the new bill because it created new jobs and gave unionized employers and employees relief from a "70 year old law prevent[ing] employers from having overtime agreements with labor unions even though both management and labor wanted to work longer hours in a shorter work week." Id. Thus, section 750.5 was intended to benefit and does benefit union employers and employees in the mining industry.

The benefit granted by section 750.5 does not extend to non-union mine workers, however. By its express terms, section 750.5 only applies to mine workers covered by "valid collective bargaining agreements." Only union mine employees may implement work shifts in excess of eight hours to achieve flexibility in their work schedules. In contrast, non-union mine employees (such as Viceroy's Castle Mountain workers) are limited to eight-hour shifts and five-day work weeks. Because section 750.5 confers a state benefit only upon unionized mine employees, it creates incentives to unionize which burden non-unionized mine employees' NLRA protected rights freely to choose not to unionize.

In the recent case of *Livadas v. Bradshaw*, ── U.S. ──, 114 S.Ct. 2068, 129 L.Ed.2d 93, 94 CDOS 4355 (1994), the Supreme Court found NLRA preemption in a context closely analogous to this one. *Livadas* involved a challenge to the State of California's policy of not enforcing Cal.Labor Code § 201 on be-

half of employees covered by collective bargaining agreements containing arbitration clauses. Section 201 requires "employers to pay all wages due immediately upon an employee's discharge, imposes a penalty for refusal to pay promptly, precludes any private contractual waiver of these minimum labor standards, and places responsibility for enforcing [section 201] on the State Commissioner of Labor." *Livadas,* —— U.S. at ——, 114 S.Ct. at 2071, 94 CDOS at 4355. The state construed a different state law to prevent the state from enforcing section 201 on behalf of Livadas and other employees covered by collective bargaining agreements containing arbitration clauses.

Livadas argued that the state's policy "was preempted as conflicting with Livadas's rights under § 7 of the NLRA * * *, 29 USC § 157, because the policy placed a penalty on the exercise of her statutory right to bargain collectively with her employer." Id at ——, 114 S.Ct. at 2073, 94 CDOS at 4356. The Court agreed, holding that the state's policy of nonenforcement of labor standards only with respect to unionized employees covered by arbitration clauses was preempted by federal law because it interfered with such employees' NLRA rights. Id. The *Livadas* Court stated:

> A state rule predicating benefits on refraining from conduct protected by federal labor law poses special dangers of interference with congressional purpose. * * * the [state] has presented Livadas and others like her with the choice of having state-law rights * * * enforced or exercising the right to enter into a collective-bargaining agreement with an arbitration clause. This unappetizing choice, we conclude, was not intended by Congress, * * * and *cannot ultimately be reconciled with a statutory scheme premised on the centrality of the right to bargain collectively* and the desirability of resolving contract disputes through arbitration. Cf *Metropolitan Life Ins Co v. Massachusetts,* 471 U.S. 724, 755 [105 S.Ct. 2380, 2397, 85 L.Ed.2d 728] (1985) (state law held not pre-empted because it "neither encourage[s] nor discourage[s] the collective bargaining processes").

Id at ——, 114 S.Ct. at 2074–75, 94 CDOS 4356–57 (emphasis added).

*Livadas* strongly supports this court's conclusion that section 750.5 is preempted by the NLRA. The *Livadas* Court justified its ruling, in part, upon the principle that a state cannot confer benefits in a manner interfering with an employee's right freely to chose to unionize, guaranteed by section 7 of the NLRA. The *Livadas* Court stated:

> While the NLRA does not expressly recognize a right to be covered by a collective-bargaining agreement, in that no duty is imposed on an employer actually to reach agreement with represented employees, see 29 USC § 158(d), a State's penalty on those who complete the collective-bargaining process works an interference with the operation of the Act * * *.

Id at ——, 114 S.Ct. at 2074 n. 11, 94 CDOS at 4356 n. 11. Section 7, however, protects both the right to choose to unionize *and* to choose not to unionize. See 29 U.S.C. § 157. Thus, the rationale of *Livadas* logically extends to this case to prevent the state from granting benefits only to unionized mine workers through section 750.5 in a way that interferes with mine workers' rights freely to chose *not* to bargain collectively.

■■■ Citing the Supreme Court cases of *Metropolitan Life,* 471 U.S. at 758, 105 S.Ct. at 2398–99, and *Fort Halifax Packing Co v. Coyne,* 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), the state argues that section 750.5 is not preempted because the eight-hour shift limitation is simply a state-wide minimum labor standard. "When states have enacted statutes intended to provide minimum benefits to employees and not intended to interfere with the bargaining position of the parties, the Supreme Court has upheld state benefit statutes against *Machinists* preemption challenges." *Babler Bros, Inc v. Roberts,* 995 F.2d 911, 915 (9th Cir 1993).

The minimum labor standards doctrine established in *Metropolitan Life* and *Fort Halifax* is inapplicable here because section 750.5 does not affect union and non-union employees equally. In *Metropolitan Life,* the Supreme Court emphasized that "minimum state labor standards" survived under

the NLRA because they affected union and non-union employees equally:

> *Minimum state labor standards affect union and nonunion employees equally, and neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA.* Nor do they have any but the most indirect effect on the right of self-organization established in the Act. Unlike the NLRA, mandated-benefit laws are not also designed to encourage or discourage employees in the promotion of their interests collectively * * *. Nor do these laws even inadvertently affect these interests implicated in the NLRA. Rather, they are minimum standards "independent of the collective-bargaining process [that] devolve on [employees] as individual workers, not as members of a collective organization."

471 U.S. at 755, 105 S.Ct. at 2397 (emphasis added). The *Metropolitan Life* Court upheld a Massachusetts law requiring all general health insurance policies to include mental health coverage because it was a minimum labor standard statute of general applicability.

*Fort Halifax* involved a Maine statute requiring employers that closed down factories to provide employees with severance pay equal to one week's wages for each year the employee worked at the plant. 482 U.S. at 5, 107 S.Ct. at 2214. The statute did not apply to employees with an employment contract already containing a severance pay provision. Id. The Court held that the statute was not preempted by the NLRA because it was a minimum labor standard under *Metropolitan Life.* Id at 19–23, 107 S.Ct. at 2221–23. In *McCollum,* 17 F.3d at 1223, the Ninth Circuit noted that the *Fort Halifax* decision is aligned perfectly with the *Metropolitan Life* rule that state minimum labor standards must affect union and non-union employees equally:

> The severance benefits in *Fort Halifax* were available to union and nonunion employees alike, as long as they either did not have an employment contract, or had one that did not deal with severance. Conversely, if an employee did have a contract with a severance provision, then statutory benefits were unavailable, whether or not the employee belonged to a union.

Id.

In marked contrast to the statutes involved in *Metropolitan Life* and *Fort Halifax,* section 750.5 is not a statute of general applicability because it only grants benefits to union employees and not to non-union employees. The state would, of course, have the court believe that section 750.5 is simply an "opt-out" provision allowing unionized mine workers to waive their statutory right to the "benefit" of working no more than eight hours a day. Any attempt to characterize the eight-hour shift limitation as a "minimum benefit" for mine workers is disingenuous in light of the overwhelming evidence that the prohibition is highly onerous to employees and employers of the mining industry. As the court noted above, the only real benefit conferred by sections 750 and 750.5 is the right given to unionized mine workers to "opt-out" of the unduly restrictive limitations of section 750. Non-unionized mine workers, meanwhile, are denied the right to work any overtime. Because section 750.5 confers state benefits only to unionized mine workers, it cannot be deemed a minimum labor standard, see *Bechtel Constr, Inc. v. United Broth. of Carpenters,* 812 F.2d 1220, 1226 (9th Cir.1987) ("[u]nlike the minimum benefit standards in *Metropolitan,* the California requirements do not affect all workers equally, but concern only apprentices"), or a legitimate "opt-out" provision, see *Livadas,* —— U.S. at ——, 114 S.Ct. at 2082 n. 26, 94 CDOS at 4360 n. 26.

Finally, the state argues that section 750.5 should not be preempted by the NLRA because the state has a legitimate regulatory interest in limiting non-union mine worker shifts to eight hours. Section 750 is allegedly necessary to prevent employers from arbitrarily assigning mine workers to overtime. According to the state, the union exception to the eight-hour shift limitation is justified because union employees have sufficient collective power to resist unilateral employer decisions regarding overtime.

The court is not persuaded that a state regulatory interest can justify burdening the collective bargaining process and the NLRA

rights of mine workers. As the Supreme Court stated in *Livadas*, — U.S. at —, 114 S.Ct. at 2076, 94 CDOS at 4357:

> In labor pre-emption cases, as in others under the Supremacy Clause, [the court's] office is not to pass judgment on the reasonableness of state policy [citation omitted]. It is instead to decide if a state rule conflicts with or otherwise "stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of the federal law. [citation omitted].

The *Livadas* Court rejected the idea that "constitutional analysis under the Supremacy Clause is an open-ended balancing act, simply weighing the federal interest against the intensity of local feeling * * *." *Id.*

The scope of federal preemption must be divined from congressional intent. *Metropolitan Life*, 471 U.S. at 747, 105 S.Ct. at 2393. There is absolutely no evidence that Congress meant to allow any state regulatory interest, legitimate or not, to trump an employee's NLRA rights. Although the Supreme Court has held that a state may discriminate between union and non-union employees in exercising *proprietary* power as opposed to regulatory power, *Building & Constr. Trades Council v. Associated Builders & Contractors, Inc.*, — U.S. —, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993), that rule obviously does not apply to Section 750.5, which clearly advances a *regulatory* purpose. See, e.g., *McCollum*, 17 F.3d at 1223.

In fact, the Supreme Court has held that legitimate state regulatory interests do not justify interference with rights protected by the NLRA. *Golden State Transit*, 475 U.S. at 618, 106 S.Ct. at 1400–01. For example, "in the transportation area, a State may not ensure uninterrupted service to the public by prohibiting a strike by the unionized employees of a privately owned local transit company." *Id.* Simply stated, this court is unaware of any legislative or judicial authority recognizing a "state regulatory interest exception" to *Machinists* preemption.

Nor would such an exception make much sense. The collective bargaining process is established and governed by federal law. As noted above, Congress intended to protect an employee's federal right to choose between unionization and non-unionization. The decision to unionize or not to unionize is to be affected only by incentives created under federal labor law, see, e.g., 29 U.S.C. § 207(a)–(b), and by normal market forces. A "state regulatory interest exception" to NLRA preemption would allow each state to exercise its police power in a way that disrupts this carefully crafted balance. As a result, employees' NLRA freedoms would vary vastly from state to state and the uniformity of federal labor law would be impaired, if not utterly destroyed. Each state could, through "legitimate" exercises of its police power, effectively dictate the forces governing an employee's choice to unionize. Congress could hardly have contemplated such a scheme. Thus, the court declines to recognize a "state regulatory interest exception" to *Machinists* preemption.

Of course, a state could confer benefits in a discriminatory fashion if such discrimination is mandated by federal preemption principles. *McCollum*, 17 F.3d at 1221. "If extending a state benefit to union employees would create [federal] preemption difficulties, then excluding such employees, even if it works a disparate hardship on them—i.e., 'discriminates' against them—is not only permissible under preemption law, it is required by it." *Id.* In that type of case, however, the employee's NLRA right freely to join or not to join a union gives way to *federal* preemption policies, not *state* interests. The *Machinists* preemption doctrine obviously *does not protect NLRA rights from burdens imposed by federal laws or interests.* The state has no basis here, however, to claim that the disparate treatment of unionized mine workers under section 750.5 is compelled by principles of federal preemption.

Finally, the court's rejection of a "state regulatory interest exception" to NLRA preemption is not contrary to *McCollum*. The state claims the Ninth Circuit in *McCollum* recognized a general "state interest exception" to NLRA preemption. But, in truth, that court never reached the issue whether a state interest can justify burdening NLRA rights. The *McCollum* court simply held that Oregon would not qualify for any "state interest exception" *even if one existed* be-

cause Oregon did not present any reason for granting state benefits in a discriminatory fashion. See *McCollum*, 17 F.3d at 1222. Moreover, that court expressly acknowledged the possibility that no state interest could ever justify burdening an employee's freedom of choice in unionizing or remaining non-unionized, stating: "we need not resolve the question of when, *if ever*, a state's exclusion of benefits to union employees (other than an exclusion required by preemption principles) serves a legitimate function." Id (emphasis added). It is clear from the language in *McCollum* that the Ninth Circuit deferred decision on the validity of a "state regulatory interest exception" to NLRA preemption.

In sum, section 750.5 operates in conjunction with section 750 to confer a significant benefit to union mine workers not available to non-union mine workers. The effect, if not the intent, of section 750.5 is to create incentives for mine workers to unionize. If non-union mine workers, such as Viceroy's Castle Mountain employees, do not unionize, they are faced with inflexible schedules, long and dangerous commutes and even the loss of their jobs because their employer may not be able to function economically under the eight-hour shift limitation. The state's two-tiered system creates substantial, if not compelling, incentives for mine workers to unionize. Congress would not have tolerated this extensive burden on mine workers' NLRA protected freedom to choose to unionize or not to unionize.

For the above reasons, the court holds that section 750.5 is preempted by the NLRA under the *Machinists* doctrine. Accordingly, Viceroy's motion for summary judgment on its NLRA preemption claim based on *Machinists* is hereby **GRANTED.** Because Viceroy has obtained relief under that claim, the court declines to rule on Viceroy's *Garmon* preemption and equal protection claims at this time. Viceroy's motion for summary judgment on those claims is hereby **DENIED WITHOUT PREJUDICE.**

Viceroy should note that the court's invalidation of the section 750.5 union exception does not affect the validity of section 750, a rule of general applicability. As discussed above, the court is not in a position to grant relief from section 750. Thus, the eight-hour shift limitation of section 750 remains operative, applying to union and non-union mine workers alike.

While this outcome may not completely satisfy the parties or unionized mine workers (because changed circumstances may have made the eight-hour shift limitation burdensome), it is dictated by the NLRA and the law of federal preemption. Whether California mine workers ultimately should be relieved from the eight-hour shift prohibition and the form of such relief, if any, are questions best addressed by the California Legislature. This court simply holds that the state may not grant relief from the prohibition in a manner that burdens mine workers' NLRA rights.

Within seven (7) days of the filing of this order, Viceroy is directed to file and serve a proposed form of judgment to be entered in this case. Defendants will have seven days thereafter to file and serve written objections to the proposed form of judgment.

IT IS SO ORDERED.